THE FIRST NATIONAL BANK OF SCHULENBURG, TEXAS V.
JOE WINKLER ET AL.

No. 7835. Decided April 15, 1942.
Rehearing overruled May 20, 1942.
(161 S. W., 2d Series, 1053.)

132

*Edward S. Boyles, Fred Blundell* and *Willard L. Russell,* all of Houston, for plaintiff in error.

It was error for the court to hold that the deposits in question was to be held by the defendant bank "for the particular purpose of paying the checks issued by plaintiff Winkler in payment for cotton purchased from his gin patrons," as the testimony showed that no instructions were given to the bank "to

hold the deposits for any particular purpose." Steere v. Stockyards National Bank, 113 Texas 387, 256 S. W. 586; Craig v. Bank of Granby, 238 S. W. 507; 9 C. J. S. 631.

*J. W. Ragsdale,* of Victoria, for defendants in error.

When the bank accepted the money deposited by Pratka to Winkler's account, it knew that said money was given in payment of cotton belonging to the farmers and became the holder thereof in trust, for the true owners without any regard to its mode and manner of handling the account. Interstate Natl. Bank v. Claxton, 97 Texas, 569, 80 S. W. 604; U. S. F. & G. Co. v. Adoue, 104 Texas 379, 137 S. W. 648.

MR. PRESIDING JUDGE HARVEY delivered the opinion of the Commission of Appeals, Section A.

This is a class suit, brought by Joe Winkler and Charles Ulrich, in behalf of some thirty-odd farmers, against The First National Bank of Schulenburg, Texas. The trial of the case was begun before a jury, but, at the conclusion of the testimony, the court withdrew the case from the jury and rendered judgment for the plaintiffs. The bank appealed and the Court of Civil Appeals affirmed the judgment of the trial court. 146 S. W. (2d) 201. The bank has been granted the writ of error.

The question of prime importance is whether or not, under the undisputed facts shown in evidence, the bank had the right of set-off in relation to a portion of the general checking account of Winkler which was carried in the bank. On August 28, 1937, and for a year or more before that date, Winkler owed the bank a debt of $2,800, and on the date named the bank appropriated to pro tanto payment of said debt, the entire amount of $2,752.50 which stood to the credit of Winkler in his general checking account. In this account there had been deposited by one E. H. Pratka, from time to time, (in accordance with a prearranged plan hereinafter explained) various sums which, in the aggregate amounted to the sum of $2,273; and Winkler had given checks aggregating the last named amount, to various farmers in payment for cotton which he had bought from them. All these checks were drawn against said general checking account of Winkler in the bank. They are held by the beneficiary plaintiffs. It is claimed that in relation to the sum which Pratka had deposited in said account,

the bank, as against the said farmers, had no right of set-off. This claim is based on the following facts:

In July, 1937, about the opening of the ginning season, Winkler, who operated a cotton gin, and E. H. Pratka, who was engaged in the cotton business in Schulenburg, contrived a plan in accordance with which Winkler was to purchase cotton from his gin customers and resell the cotton to Pratka. In relation to said plan, and to the consent thereto by the president of the bank, there is no testimony contained in the record but that of Winkler and of Pratka. In so far as same is material, the testimony of Winkler is as follows:

"I got the market price from him as to what I was to pay for the cotton; I bought the cotton, and Mr. Pratka came over and got it himself in his truck, and I would give him an invoice for the cotton at the price I bought it, and he deposited the money in the First National Bank to cover it.

"Q. Did you tell the officers of the bank about this agreement.?

"A. Yes, sir, we told the officials at the First National Bank that I was buying this cotton ginned at my gin and that Pratka was going to pay for it."

On cross examination he testified:

"Q. I wish you would tell me again what it was that you told Crumsek, what words did you use in telling him of this agreement?

"A. That I was going to buy cotton for Pratka, and that he was going to put the money in the bank, and that it belonged to the farmers.

"Q. You were going to buy cotton for Pratka, and Pratka was going to put the money in the bank to pay the checks, is that it?

"A. Yes sir.

"Q. * * * *

"Q. You don't mean to say by your testimony that each time a bale was bought that Mr. Pratka made a deposit for that particular bale?

"A. No sir.

"Q. Sometimes it would accumulate until you had several bales on hand?

"Q. Isn't it true that as to each deposit that Mr. Pratka made that you personally made out the deposit slips for Mr. Pratka to deposit to your account?

"A. Yes sir.

"Q. And he gave the deposit slips to the bank together with his check for the amount of the deposits?

"A. Yes, sir."

Pratka's pertinent testimony with regard to the issue in question was as follows:

"We went to the First National Bank every year, and as I recall Mr. Winkler went with me a couple of times at least— I went to the bank and told the officials of the bank, the entire crew generally, Mr. Steinman and Mr. Crumsek being among them as I recall, that Joe Winkler had agreed to buy cotton within my limits at the market price, and that afterwards I was to take it off his hands at his cost regardless of the market. We did that every year.

"Q. How was it paid?

"A. With his check.

"Q. That was discussed with the bank?

"A. Yes sir.

"Q. How were these checks to be drawn?

"A. Joe Winkler paid for the cotton with his own check, and in turn I was to take the cotton off his hands, and pay for it with my check deposited in the bank in his account after I received the invoice for it or the cotton.

"Q. What did the bank officials say when you told them of his arrangement?

"A. They just nodded their heads.

"Q. That agreement was satisfactory with the bank?

"Yes sir."

On cross examination he further testified:

"Q. Isn't it a fact that boiled down the agreement was that you would buy the cotton from Joe Winkler that he had bought from the people ginning at his gin?

"A. Yes sir.

"Q. And that if and when he had delivered you this cotton or sent you an invoice you made out check for the cotton to Joe Winkler?

"A. Yes sir, after I had checked the invoice and saw that the cotton was there, then I made a check in favor of Joe Winkler.

"Q. And the only other connection you had with the transaction was seeing that the money you owed him for the cotton got into his account at the bank?

"A. Yes sir.

"Q. He wasn't your agent?

"A. No sir.

"Q. Who he bought the cotton from was his business?

"A. Yes sir.

"Q. Your only concern was that if he bought the cotton and delivered it to you, you were to pay him for it?

"A. Yes sir.

"Q. Did it make any difference to you how he ran the account?

"A. No sir.

"Q. It mattered not to you if he paid his living expenses out of it?

"A. No sir.

"Q. Your transaction or connection with the matter ended when you deposited the money in the bank for Joe Winkler's account for the cotton he sold to you?

"A. Yes sir.

"Q. If there was any variance in classing or weighing the cotton you made a deduction from your check or had an adjustment with him later?

"A. Yes sir.

"Q. You say you don't remember the date, but assuming that his account was closed on the 28th of August, 1937, after some of these checks were turned down, did some of these parties come to you?

"A. Yes sir, they came to me to ask what were they going to do about it.

"Q. And you told them that Joe Winkler bought the cotton and whatever redress they had to get it from him?

"A. Yes sir.

"Q. It was none of your concern?

"A. No sir.

On redirect examination he further testified:

"Q. You did not send or give Joe Winkler individually the money for this cotton, but deposited in his name in the bank?

"A. Yes sir.

"Q. Why were you depositing that in the bank?

"A. Because of the verbal agreement we had between Joe Winkler and myself and the bank naturally, because he had issued checks against this account.

"Q. And the bank knew that?

"A. Yes, sir, I told them I was going to buy Joe Winkler's cotton."

On being recalled to the witness stand for further cross-examination, Pratka testified as follows:

"Q. When you went to the bank and had this conversation,

what was it that you and Winkler and the Bank agreed with reference to what the bank should do?

"A. I went to the bank and told them that Joe Winkler was going to buy cotton at the market price, and that I was to take it off his hands at his cost, and that after I was delivered the cotton, or the invoice, and had checked it up, I would make a deposit in his account to cover the amount of it. The bank officials nodded that it was all right with them.

"Q. Was anything said in that conversation by either you, Winkler or the bank officials as to what the bank would be required or expected to do, or that they were to hold these deposits for any particular purpose?

"A. No sir.

"Q. Was anything said in that conversation, either by you, Winkler or any bank official there that the bank was expected to honor any particular farmer's check who had sold cotton to Winkler?

"A. No sir, nothing was said."

■ Ordinarily the relation between the bank and a depositor is that of debtor and creditor, and, as a consequence, the bank has the right to set-off the amount of the deposit against an equal amount of indebtedness which the depositor owes the bank. This right is accorded by equity to the bank, and same may be waived by the bank or be overborne by the superior equity of a third person. (6 Tex. Jur. p. 234). The origin and nature of the bank's right of set-off is thus explained in Van Winkle Gin Co. v. Bank, 89 Texas 147, 33 S. W. 862:

"The relation of the bank to its depositors is that of debtor and creditor, and its right to offset its indebtedness to the depositor against the indebtedness of the latter to it is of an equitable nature intended for its protection, and does not depend upon any statute in relation to offsets. It is generally said that it is optional with the bank whether it will avail itself of this right. 32 Mo., 191 6 N. Y., 271; 34 Barb., 298; 2 N. Y., 352; 6 Wend., 610; 21 Me., 426; 16 Week., No. Cas., 509."

In the typical case of Steere v. Bank, 113 Texas 387, 256 S. W. 586, it was decided that the bank there had no right of set-off as against certain third persons who were holders of a superior equity. The decision is rooted entirely in equitable doctrine, and equitable remedies are employed.

■ We now take up for examination the testimony of Winkler and of Pratka set out above. Discarding from consideration the testimony of Winkler wherever it conflicts with that of Pratka, it is discovered that the undisputed facts show that the plan devised by Winkler and Pratka was agreed to by the bank, and that such plan comprehended (1) the giving of checks by Winkler to the farmers for their cotton; (2) the paying of the checks from the general checking account of Winkler; and (3) the depositing by Pratka, in said account, of the amount of the purchase price which he was to pay Winkler for the cotton. The agreement of the bank to these features of the plan necessarily implies the exclusion of any right of the bank to divert said cotton funds to the payment of any indebtedness due the bank by Winkler. In good conscience, the said cotton funds belonged to said farmers. Regardless of the fact that said funds constituted a part of the general checking account of Winkler, the equitable claim of the farmers in respect to the funds, was superior to the bank's right of set-off. Steere v. Bank, supra.

The judgment of the trial court and that of the Court of Civil Appeals are affirmed.

Opinion adopted by the Supreme Court April 15, 1942.

Rehearing overruled May 20, 1942.