**BRADLEY GRAIN COMPANY, Inc.,**
Appellant,

v.

**FARMERS & MERCHANTS NATIONAL BANK, Abilene, Texas, Appellee.**

No. 3124.

Court of Civil Appeals of Texas.

Eastland.

Nov. 19, 1954.

Rehearing Denied Jan. 14, 1955.

Earnest L. Langley, Hereford, for appellant.

Hudson, Smart, McMahon, Springer, Smart & Walter, Abilene, for appellee.

LONG, Justice.

In 1952, and at all times material here, J. S. Noill of Abilene, Texas, hereinafter referred to as Noill, was·a dealer in pro-

duce, lumber and farm commodities of various kinds. The Farmers & Merchants National Bank, hereinafter referred to as Bank, was a national bank with its principal office in Abilene, Texas. Bradley Grain Company, Inc., hereinafter referred to as Bradley, operated a grain elevator in Hereford, Texas, and engaged in storing and selling maize and other grains. Bradley instituted this suit against the Bank to recover upon a check in the sum of $17,909.-16 given by Noill to Bradley on the Bank in payment of grain which was not paid by the Bank because of insufficiency of funds in Noill's account to cover the check. Bradley alleged that Noill was engaged in buying and selling commodities in the following way and manner, that is, that he would purchase grain or other merchandise in the area of production, giving his personal check in payment therefor, drawn on the Bank; that Noill would then transport the commodity to an area of more favorable markets and sell it, remitting the proceeds to the Bank for deposit to cover the check given when he purchased the commodity. Bradley further alleged that the Bank knew about, acquiesced in and encouraged this procedure; that the Bank knew of this course of dealings, by reason of the fact that Noill's account was often overdrawn in large amounts; that the Bank had encouraged this procedure by suggesting to Noill that he procure a guaranty which would enable the Bank to pay checks when the deposit had not been received and that, in furtherance of this suggestion, Noill procured T. O. McCamant to sign the above mentioned guaranty. It was further alleged that Noill informed Bradley of his arrangement with the Bank and McCamant and that Bradley, relying on said arrangement, accepted from Noill his checks in payment for grain sold and delivered to him; that for a period of several months Noill bought grain from Bradley, giving his personal checks in payment therefor and that said checks were always paid when presented to the Bank. That on or about April 8, 1952, Noill gave Bradley a check in the sum of $17,909.16 in payment for all grain delivered to his account since his last trip to Hereford; that Noill then went to California where he received payment from the Robert R. Reed Grain Company of Los Angeles for the identical grain which had been sold him by Bradley and a part of which payment was made to Noill in cash and the balance, $15,538.05, was to have been made as usual by check which was to have been made payable to the order of J. S. Noill and mailed by the Robert R. Reed Grain Company to the Bank for deposit to Noill's account; that Bradley deposited the check for $17,909.16 in the Hereford Bank but when said check was presented to the Bank in Abilene payment was refused; that Bradley immediately talked to the Bank in Abilene by telephone to ascertain the reason for nonpayment of said check; that an officer of the Bank informed him that no deposit had been received from California to cover same and that Noill was already overdrawn and the Bank was unable to pay the check; that Bradley telephoned Robert R. Reed Grain Company at Los Angeles and was advised that the grain company's check in the amount of $15,538.-05 had been mailed to the Bank in Abilene for deposit to Noill's account; that Bradley again telephoned the Bank's cashier and informed him that Bradley was having Robert R. Reed Grain Company send its check to the Bank for deposit to Noill's account and that Bradley was again placing the $17,909.16 check in channels for collection so that it would be presented for payment out of the proceeds of the sale of said grain. Bradley further alleged that Noill deposited in the Bank the sum of $2,097.15 in cash which represented a portion of the proceeds of the sale of the grain in California which was bought from Bradley and that, together with the $15,538.05 check sent by Robert R. Reed Grain Company, represented the proceeds from the sale of the grain bought from Bradley by Noill and paid for by Noill's check to Bradley for $17,909.16; that such deposits were made by Noill for the specific purpose of providing funds with which to pay said check; that this fact was well known to the Bank, both by reason of the course of dealings heretofore described between the Bank and Noill and the guarantor McCamant and by reason of the telephone conversa-

tion between the cashier of the Bank and Bradley; that the Bank disregarded the course of dealings and its knowledge of the particular transaction and refused to pay Bradley's check for $17,909.16 and applied more than $7,000 of the proceeds from the sale of the grain in California to the payment of overdrafts which the Bank was carrying on Noill's account; that thereafter on May 1, 1952, on the authority of Noill, the Bank sent to Bradley its cashier's check in the sum of $10,500 in partial payment for said grain, thereby leaving a balance owing to Bradley of $7,409.16 for which Bradley sues. The Bank answered by special exceptions and a general denial. Upon the trial, at the conclusion of the evidence, both sides moved for a directed verdict. The court withdrew the case from the jury and entered judgment that Bradley take nothing. Bradley has appealed.

By points one and two, appellant contends the Bank either expressly or impliedly agreed to pay the $17,909.16 out of the money deposited in the Bank as the proceeds from the sale of the grain by Noill to Reed. We cannot sustain these points. At the time the $17,909.16 check was returned to Bradley unpaid, Mr. Bradley, president of Bradley Grain Company, called Mr. Ellis, an officer of the Bank, and asked him why the check had been returned. Mr. Ellis advised him that Noill was overdrawn at the Bank for more than $5,000.00 and that the Bank could not pay his check. Ellis also advised Bradley that the check from California from Robert R. Reed Grain Company had not arrived at the Bank. Mr. Bradley told Mr. Ellis that he would contact the Reed Grain Company and ascertain why the check had not been sent; that there was sufficient grain in California to more than cover the $17,909.16 check and that he would see what happened and that Mr. Ellis said: "That would be fine." On this point we quote from the testimony of Mr. Bradley as follows:

"A. I asked Mr. Ellis why he had returned the check, our check to the Grain Company, and he said that Noill didn't have the money in the bank. I asked Mr. Ellis if the check had come in from Robert Reed Grain Company in California in payment to Mr. Noill for our grain. He said, No, the check had not reached their bank. I told Mr. Ellis that I would get on the phone immediately and see what had happened to that check that Noill had enough grain in California to more than cover our $17,000.00 check, and I would see what happened. Mr. Ellis said that would be fine. I also told Mr. Ellis that I would have our bank just send the check back through for payment. I don't believe we even made another deposit slip, just had them send it back through.

"Q. Did or did not Mr. Ellis tell you that the check would be paid when it came back through?

"A. I didn't even ask him if it would be paid or anything about it because I had already told him there would be enough money come to pay the check, and I would check into it and see why the check had not reached his bank from Robert Reed Grain Company in Los Angeles."

■ It will be seen from the above evidence that Mr. Ellis, representing the Bank, did not at any time agree to pay the check. In fact, Mr. Bradley did not ask him if he would pay it. From this it cannot be said that there was either an expressed or an implied agreement on the part of the Bank to pay the $17,909.16 check.

■ If it should be conceded the Bank agreed to pay the check there would still be no liability. The Uniform Negotiable Instrument Act, Articles 5932 to 5948, Vernon's Annotated Civil Statutes, is decisive of this question and adverse to appellant.

"Sec. 185. A check is a bill of exchange drawn on a bank payable on demand. Except as herein otherwise provided, the provisions of this Act applicable to a bill of exchange payable on demand apply to a check."

"Sec. 127. A bill of itself does not operate as an assignment of the funds

in the hands of the drawee available for the payment thereof, and the drawee is not liable on the bill unless and until he accepts the same."

"Sec. 189. A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check."

"Sec. 132. The acceptance of a bill is the signification by the drawee of his assent to the order of the drawer. The acceptance must be in writing and signed by the drawee. It must not express that the drawee will perform his promise by any other means than the payment of money." Uniform Negotiable Instruments Act, Rev.St.1925, Arts. 5932–5948; Huffman v. Farmers' Nat. Bank of Cross Plains, Tex.Civ. App., 10 S.W.2d 753.

It is clear the Bank did not accept the check under the terms of the above statute. Section 132 provides that the acceptance must be in writing and signed by the drawee. The Bank never did at any time either orally or in writing agree to pay the check. The check did not operate as an assignment of any funds to the credit of Noill in the Bank and the Bank is not liable to Bradley unless and until it accepts or certifies the check. This it has not done. Huffman v. Farmers' Nat. Bank of Cross Plains, supra; First Nat. Bank of Mathis v. Dickson, Tex.Civ.App., 59 S.W.2d 179; Kilgore Nat. Bank v. Moore Bros. Lumber Co., Tex.Com.App., 102 S.W.2d 200.

■ Under these points it is contended that Bradley relied upon the belief that the Bank would pay the $17,909.16 check out of the proceeds of the Robert R. Reed Grain Company check and was caused to change its position to its detriment by reason of the failure of the Bank to pay said check. Bradley contends that it would have caused Reed Grain Company to pay the money for the grain directly to it if it had not believed the Bank would pay the check after the Reed check was received

by the Bank. We find nothing in the pleadings or the evidence to support this theory. The evidence is conclusive that Reed had sent the Bank a check payable to Noill for $15,538.05 in payment of the grain prior to the time Bradley called Reed. This check became lost. Reed stopped payment on the check and mailed a duplicate check to the Bank.

■■ Appellant, by its third point, contends the trial court erred in overruling its motion for an instructed verdict because the undisputed evidence shows that appellant actively procured the deposit of the Robert R. Reed Grain Company check to Noill's account in the Bank for the purpose of paying the outstanding check given by Noill to appellant in payment for the grain sold by Noill to Robert R. Reed Grain Company and that the Bank had actual knowledge of all of said facts prior to the time the Bank applied a part of such deposit to the payment of the indebtedness owed by Noill to the Bank. This point cannot be sustained. A check is authority to the Bank to pay to the holder thereof the amount of the check and guarantees no liability against the Bank until accepted by it or until the Bank has bound itself by a promise or representation. 6 Tex.Jur. 270. As has been heretofore stated, the Bank did not at any time agree to pay the check. Bradley was a general creditor of Noill. In fact, Noill bought the grain from Bradley on an open account and paid therefor with the check in question at the end of a week's operation. In other words, Bradley did not rely upon the check at the time the grain was delivered to Noill. Prior to this transaction Noill had been buying grain from Bradley over a period of several months and had been paying for each load of the grain at the time it was received but he increased his operation. We quote from the testimony of Mr. Bradley as follows:

"Q. Now, over how long a period did that continue, Mr. Bradley?

"A. That particular arrangement continued for I imagine about a year. Then he came in one day and the milo

market was real good in California, and I got to know him real well, and I trusted him and thought a lot of him, and think he was a fine man. He said, 'Jack, I have got a chance to make some money on this milo deal in California.' Said, 'if you can sell me two or three million pounds of milo at one time where I can go to California and contract it out there, and know what I am going to get for it, then I can hire eight or ten trucks to help me, and I can make ten cents a hundred on what the other trucks haul as well as running my own.'

"Q. Did you make arrangements with him to—along that general nature?

"A. Yes, I did."

■ There was no fiduciary relation existing between Noill and Bradley. When the grain was delivered to Noill by Bradley the title thereto vested in Noill. He did not receive it as a broker to be sold on commission, consequently the proceeds from the sale of the grain to Reed belonged to Noill and were not held by him in trust for Bradley. Bradley had no lien on the grain or the proceeds from its sale. Bradley had no right to direct the Bank to receive the check from Reed as a special deposit. The evidence shows that Robert R. Reed Grain Company sent the check to the Bank in an envelope without any direction as to how it should be deposited except that it was to go to the credit of J. S. Noill. The check was endorsed by J. S. Noill. Noill gave no direction to the Bank as to how the deposit was to be made. "To change a general deposit into one of a special character, there must be some act, at least on the part of the depositor, tending to segregate the funds in the bank's possession and to segregate them for a particular purpose." 9 C.J.S., Banks and Banking, § 274, p. 570.

■ By its fourth and sixth points appellant contends the evidence shows that the Reed check was for proceeds of the grain and that the equity of Bradley in the proceeds was superior to that of the Bank. Appellant relies upon the First Nat. Bank of Schulenburg v. Winkler, 139 Tex. 131, 161 S.W.2d 1053, to support his position. In that case Winkler owned a gin and bought cotton for one Pratka, giving his personal check therefor. Pratka would then deposit in Winkler's account the amount of the checks issued in payment of the cotton. The bank applied $2,700 of the account to a note owed by Winkler to the bank. The court held that ordinarily the relation between a bank and its depositor is that of "debtor and creditor" and that the bank has the right to set off the amount of the deposit against the amount of the indebtedness which the depositor owes the bank, but that, in view of the fact that the bank had knowledge of the fact that Pratka was depositing the money in Winkler's account for the purpose of paying off the checks that Winkler had given in payment of cotton, that in equity the checks Winkler had given for cotton should be paid first before the bank would have the right to offset any indebtedness due it by Winkler. Appellant also cites the case of Steere v. Stockyards Nat. Bank, 113 Tex. 387, 256 S.W. 586. In that case Herbert Graves was a depositor in Stockyards National Bank. He was engaged as a commission man on the stockyards in Fort Worth selling cattle on commission for the public. He deposited the proceeds of the sale of these cattle in Stockyards National Bank over a period of many years. The bank was familar with his mode of operation. The bank knew that he was a commission man and that the money he received from the proceeds of the cattle were trust funds. It was there held that the bank could not use the money Graves had received for the cattle for the payment of a debt to the bank by Graves. We are not in conflict with these cases when we hold that the bank had the right to apply the proceeds of the Reed Grain check to cover an overdraft that Noill had with the bank. As has been heretofore stated, Noill was not the agent of either Reed or Bradley. He bought and sold the grain in the open market. He was not a commission mer-

chant. The money he received in payment for the grain was not a trust fund. He bought the grain from Bradley on an open account. At the time the grain was delivered to him the title thereto passed and he was its owner. He had a right to sell the grain to Reed and receive the proceeds therefor. In the absence of any direction from Noill to make the Reed check a special deposit, the Bank had the right to place it in his general checking account. The relation of debtor and creditor existed between Noill and the Bank with reference to the Reed Grain Company check. This being true, the Bank was within its rights in applying the proceeds of the check to the payment of Noill's overdraft.

By other points, appellant contends the trial court erred in overruling its motion for an instructed verdict because the Bank has consented to, encouraged and acquiesced in the course of dealing by which Noill gave checks drawn on the Bank in payment for commodities and thereafter sold such commodities, depositing the proceeds from such sale in the Bank to cover his checks and that all of which created an equitable right to such deposits in the seller of the commodities. We cannot sustain this position. There is no evidence that the Bank knew of the arrangement Noill had with Bradley to buy grain for an entire week and then at the end of the week pay for the grain so received by check on the Bank. The evidence, when properly appraised, shows that Noill was engaged in the trucking business and also bought grain and other commodities which he hauled in his trucks to an area where the market was good on such commodities. He had a general account in the Bank. This account was very active, which shows that he drew thereon checks of various sizes. There is no evidence that the Bank knew he was carrying on a large scale operation with Bradley in the purchase of grain and other commodities and hauling same to California. The Bank never at any time agreed to pay any check for Noill. It is true that McCamant

executed an instrument whereby he agreed to protect the Bank up to $10,000 on Noill's account. However, this instrument was given for the Bank's protection. There is no evidence that Bradley knew at the time it received the check for $17,909.16 of any arrangement that the Bank had with McCamant. There never was enough money to the credit of Noill in the Bank to pay the $17,909.16 check. When the check reached the Bank, Mr. Ellis called McCamant and told him that the check was in and asked him if he wanted to pay it. McCamant was advised by Ellis that Noill was at that time overdrawn over $5,000. It will thus be seen that if the Bank had paid the $17,909.16 check, Noill would have been overdrawn about $22,000 and that McCamant's guarantee would not be sufficient to cover the Bank's debt against Noill. Bradley never presented the check to the Bank at any time when there was sufficient money to pay it. Noill was dead at the time of the trial. Consequently, his evidence was not available to either side. Bradley did not sue Noill but continued to do business with him after the check for $17,909.16 was not paid. The record shows that after the transaction involved here Noill had in the Bank various sums of money at times. At one time he had as much as $3,400 on deposit in the Bank. There is no evidence that Bradley ever attempted to collect the check from Noill. We fail to see any issue of fact that the court was required to submit to the jury. There was no theory plead by Bradley under which recovery could be had against the Bank. The trial court properly withdrew the case from the jury and entered a judgment that Bradley take nothing.

We have carefully examined all points of error raised by appellant and find no reversible error in any of them.

The judgment of the trial court is affirmed.

GRISSOM, C. J., and COLLINGS, J., concur.