OTIS C. METZGER V. STATE.

No. 30,745. June 24, 1959.

WOODLEY, Judge, concurred.

*Borden & Hand,* by *D. B. Hand,* Weatherford, for appellant.

*Leon Douglas,* State's Attorney, Austin, for the state.

BELCHER, Judge.

The conviction is for felony theft by false pretext; the punishment, five years.

The single count indictment was in the ordinary form for felony theft, it being charged therein that appellant on or about May 16, 1956, fraudulently took from the possession of Malcolm A. Maupin $13,500 in money.

In the fall of 1955, appellant, Otis C. Metzger, approached Malcolm A. Maupin, the manager of the Chamber of Commerce of the City of Weatherford, and told him that he was interested in building a cement plant in that area. After several conversations between them appellant said he was going to California for about six months and would contact Maupin when he returned. Upon his return in May, 1956, appellant told Maupin that he had definitely chosen Weatherford as the site for a cement plant.

Maupin informed appellant that the Weatherford Industrial Plan, a corporation (hereinafter referred to as the W.I.P.), was created for the purpose of attracting new industries and arranged for a conference between them. Appellant appeared before the Board of Directors of the W.I.P., explained to them, among other things, the raw material available and the market survey for a cement plant in that vicinity; and that he had an option to purchase a plant in West Virginia for $125,000.00, and he asked that they raise said sum to purchase the plant. At their next meeting they informed appellant that they could not raise the $125,000. Appellant then told them that if they would raise $42,500, he would put $82,500 with it to complete the purchase price. This proposal was accepted.

Appellant, Otis C. Metzger, as party of the first part, and the W.I.P., by its President, James Doss, and attested to by its Secretary, Wren H. Hart, party of the second part, executed a written contract on May 11, 1956, providing for the purchase, removal and erection in Weatherford of the West Virginia plant.

The contract provided for an inspection by the W.I.P. of the machinery and equipment in West Virginia.

Maupin testified that one of the two persons appointed to inspect the cement plant in West Virginia could not go, so he "was directed to take that persons place * * * about fifteen minutes before we left * * * I received my instructions from one of the officers * * * Mr. Borden Seaberry * * * I believe he was the Vice president." (Seaberry did not testify.)

The testimony of the president and treasurer of the W.I.P. shows that Maupin was sent to West Virginia as the agent and representative of the W.I.P. with instructions to inspect the cement plant on which appellant had an option, and in the event he found that the plant existed for him to deliver to appellant a check on the W.I.P. for $42,500.

The W.I.P. also sent with Maupin, Harold Martsolf, who was to determine the condition of the plant.

Maupin, Martsolf, R. C. Jones (the owner of the plant), Vic Gillespie (appellant's engineer), and appellant were present at the time of and during the inspection.

Following the inspection, appellant suggested that Maupin make the check for $42,500 payable to him and R. C. Jones.

On May 16, 1956, Maupin wrote a check payable to appellant and Jones in the sum of $42,500 on the W.I.P., by him, on the Merchants and Farmers State Bank, Weatherford, Texas, and delivered it to the appellant. The drawee bank would not pay the check unless there was attached a bill of sale which included an itemized list of the machinery and equipment in the plant placing the title in W.I.P. Appellant remained in Ashland to complete said instruments and Maupin and Martsoff returned by plane to Weatherford on May 16.

The minutes of the W.I.P., dated May 17, as shown in the record, recite that a special meeting was called and held that day for the purpose of receiving a report from Maupin and Martsolf on their inspection of the cement plant, and also to receive a report on the amount of money raised toward the $42,500 goal. The inspection report was made, and Maupin stated that a check had been "turned over to O. C. Metzger (appellant) for deliverance to R. C. Jones upon completion of said conditions which would appear in the bill of sale." The treasurer reported that $21,500 had actually been received. "The group was urged to make their contacts and take the responsibility of having all additional pledges turned in immediately."

It is shown that the investors in the project also attended the special meeting.

On May 18, 1956, appellant and Jones endorsed the check to which the bill of sale was attached and placed it with a bank in Ashland, Kentucky, for collection. Ashland is located across the state line about eight miles from the cement plant in West Virginia.

The Merchants and Farmers Bank paid the $42,500 check, charging it as a "cash item" on its books, on May 24, by cashier's check, at which time the W.I.P. had $30,500 on deposit, with arrangements made for the deficit.

On June 21, the $42,500 check was actually charged against the account of W.I.P., after it had borrowed $8,600 from said bank.

On May 29, appellant and Jones instructed the cashier at the Ashland bank to disburse the $42,500 by issuing three $4,500 cashier's checks, totaling $13,500, payable to the appellant, with the remaining $29,000 deposited in favor of Jones.

Jones testified that he sold the cement plant to the appellant for $25,000 and a condenser to go with it for $4,000; and neither the appellant nor any other person paid him an additional $82,500 for the plant and condenser.

The testimony of all the witnesses connected with the W.I.P. shows that the appellant was not to get any part of the $42,500.

After the $42,500 was paid, appellant, when asked about it in Weatherford, at first denied getting any of it, but later admitted he received $7,000.

The evidence shows that the W.I.P. had all the responsibility as well as the possession of the money raised and deposited in the bank for the purchase of the cement plant.

Appellant contends that Malcolm A. Maupin was not the owner of the $13,500, nor was he in possession of it at the time it was taken. Therefore, there is a fatal variance between the allegations in the indictment and the proof of the taking of the money.

The evidence shows that Maupin, the Manager of the Cham-

ber of Commerce of Weatherford, arranged for the conference between the appellant and the directors of the W.I.P., and as manager he also made other contacts and attended other meetings concerning the cement plant project. He was never a member, officer, or investor in the W.I.P. He was elected to make the inspection trip only after one of the two men previously selected was unable to go.

The instructions given Maupin limited his duties on the inspection trip to two things. They were: to determine the existence of the plant and upon the finding of its existence then to deliver to appellant a check drawn on the W.I.P. for $42,500. Both of these things he did. The check he delivered to appellant was an ordinary check, but at appellant's suggestion, Maupin made it payable to appellant and Jones, the owner of the plant.

Maupin had made his report to the directors of the W.I.P. on May 17, before the appellant and Jones endorsed and deposited the check for collection in Ashland on May 18.

Maupin while in Kentucky and West Virginia had only such duties as the instructions of the officers of the W.I.P. gave him. Lewis v. State, 73 Texas Cr. Rep. 44, 164 S.W. 5 and Brown v. State, 119 Texas Cr. Rep. 578, 44 S.W. 2d 721. His report in Weatherford on May 17 appears to have concluded his duties in view of said instructions. The record discloses no act of participation in any manner by him concerning the plant project after he had made the report. McGowan v. State, 89 Texas Cr. Rep. 67, 229 S.W. 323.

When the check was made, delivered or deposited for collection, it did not operate as an assignment of any part of the funds on deposit in the account of the W.I.P. Therefore, at such times there was no taking of any part of said funds.

Art. 5947, Sec. 189, Vernon's Ann. R.C.S., provides:

"A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check."

See: 6 Texas Jur. 744, Sec. 119; Conners v. State, 133 Texas Cr. Rep. 429, 111 S.W. 2d 723; McCuiston v. State, 143 Texas Cr. Rep. 283, 158 S.W. 2d 527; Bradley Grain Co. v. Farmers and Merchants National Bank, 274 S.W. 2d 178.

According to the above quoted statute and the authorities cited in connection therewith, the taking under the facts presented could not have been before May 20 or 21, the day the check was received by the Merchants and Farmers State Bank. This was after Maupin had made his report of May 17.

It is evident that Maupin was not the actual or general owner of said money.

In order to constitute a person the special owner of property under the law of theft, the special owner must have the actual control, care and management of the property at the time of the taking. This is required by the provisions of Art. 1415, Vernon's Ann. P.C. See also 41-A Texas Jur. 44, Sec. 28, and Frazier v. State, 18 Texas App. 434.

Possession must be alleged in the person having the actual control, care and management of the property at the time of the fraudulent taking. 5 Branch's Ann. P.C. 80, Sec. 2634, and cases there cited. See also: Bryan v. State, 49 Texas Cr. Rep. 196, 91 S.W. 580; Williams v. State, 101 Texas Cr. Rep. 523, 276 S.W. 282; Henshaw v. State, 118 Texas Cr. Rep. 638, 39 S.W. 2d 624; Buffington v. State, 143 Texas Cr. Rep. 560, 159 S.W. 2d 869.

For indictments for the unlawful acquisition of property from corporations: Pruitt v. State, 83 Texas Cr. Rep. 148, 202 S.W. 81; Whitaker v. State, 85 Texas Cr. Rep. 272, 211 S.W. 787; Modica v. State, 94 Texas Cr. Rep. 403, 251 S.W. 1049; Houghton et al v. State, 116 Texas Cr. Rep. 70, 32 S.W. 2d 837; Brown v. State, 119 Texas Cr. Rep. 578, 44 S.W. 2d 721; White v. State, 123 Texas Cr. Rep. 282, 58 S.W. 2d 539; Kitchen v. State, 124 Texas Cr. Rep. 358, 62 S.W. 2d 144; Langdon v. State, 135 Texas Cr. Rep. 144, 117 S.W. 2d 780; Texas Digest, Larceny, Key No. 32 (6). See also 5 Branch's Ann. P.C. 2d 72, Sec. 2626.

The evidence does not show that Maupin was the actual or general owner or that he had the actual control, care and management of the money at the time of the taking. Therefore, the proof fails to sustain the allegations in the indictment, and in the absence of such proof there is a fatal variance requiring a reversal.

No conclusion is expressed as to the other contentions presented.

The judgment is reversed and the cause remanded.

Opinion approved by the Court.

WOODLEY, Judge, (concurring).

Maupin, who was given the check to deliver to appellant, was under the state's theory the special owner of the fund contributed by 39 "investors" who were the real owners of the money used to pay off the check, and the persons injured by the theft thereof.

Bill of Exception No. 12 certifies error because of which I concur in the reversal of the conviction.

Thirty-nine investors furnished the money which appellant was charged with having stolen from Malcolm Maupin who was given the check to deliver to appellant. Until the list of these investors was read during the trial appellant had not been advised as to their identity.

Harold Coney was one of the investors who was injured by the theft. His brother-in-law Jack Gardner was on the jury.

The court certifies, in Bill 12: "The juror, Jack Gardner, obviously was not aware his brother-in-law, Harold Coney, had invested in the project prior to hearing his name read from the witness stand or he would have disqualified himself upon answers to the general questions to the panel and individual questions put to him as prospective juror. That the reading of said 39 investors before the jury was so harmful and prejudicial as to deprive the defendant of his rights of fair trial, * * * ."