**TEXAS NATIONAL BANK, Appellant,**

v.

**Dewey J. KARNES, et ux., Appellees.**

**No. 09 85 077 CV.**

Court of Appeals of Texas, Beaumont.

May 22, 1986.

Rehearing Denied June 11, 1986.

is applicable herein.

---

**2.** There is no contention that Tex.Rev.Civ.Stat. Ann. art. 4413(32c) (Vernon 1976 & Supp.1986)

390 ■ 

Dewey J. Gonsoulin, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, for appellant.

Joe L. Register, Lufkin, for appellees.

## OPINION

BROOKSHIRE, Justice.

David Karnes was 19 years old in April, 1977. He was the son of Dewey and Alice E. Karnes. David wanted to buy a 1974 Ford Van. He had located one on a used car lot in Lufkin. He could not pay cash for the 1974 Ford and arranged financing

with the Texas National Bank. The note was co-signed by his mother, Alice. The bank impressed a lien upon the certificate of title. The validity of the lien is not challenged.

David paid the monthly installments timely. But, in 1978, he defaulted. This default of payments continued until July of 1979. The bank, acting through agents, in May of 1979, repossessed the van. The van was parked near the home of Mrs. Karnes. It was unprotected from the weather.

Dewey and Alice Karnes, husband and wife, had a joint savings account in the Appellant bank of about $10,000. The balance due on David Karnes' note (and Alice's) was $3,474.41, which was charged against the savings account of the parents. No notification of charging the said $3,474.41 against the savings account was given by the bank to the parents of David. Apparently, Mrs. Karnes initially found out about this transaction while in the bank during December, 1979.

The petition was filed to recover damages for the "conversion" of the sum taken from the savings account. The Karneses also sought exemplary damages for alleged fraudulent, tortious acts of Appellant bank. The jury awarded Alice and Dewey $50,000 as exemplary damages. David recovered nothing. Mr. and Mrs. Karnes were awarded a judgment for the amount taken from their savings account, being $3,474.41, plus the $50,000 exemplary damages. The jury had, also, fixed the amount of the attorney's fees for Appellees' attorney.

The jury, in answering Special Issues, failed to find the bank had made a commercially reasonable disposition of the 1974 Ford Van after repossessing the same in May of 1979; that on July 3, 1979, the bank fraudulently obtained possession of monies of Dewey and Alice. The jury, in Special Issue No. 3, found that $50,000 was the correct amount of punitive damages that the Appellees should recover against the bank.

The jury also found that, subsequent to July 3, 1979, the bank intentionally concealed from Mr. and Mrs. Karnes the fact that their account had been debited. The jury declined to find that the Appellees either knew or should have known that the bank had debited their savings account before the date of December 22, 1979.

The judgment recited that, through a stipulation of the bank's trial attorney, the amount of actual damages was $3,474.41, with interest thereon from and after July 3, 1979, at the rate of 6% per annum. Post judgment interest was set at the rate of 10% per annum.

The bank attacks Special Issue No. 2, which found, in effect, that the Appellant bank "fraudently obtained possession of monies of Dewey Karnes and Alice Karnes", contending that the evidence is legally insufficient to support the same and that the evidence is also factually insufficient to support the jury's answer to this special issue. In an able brief, the Appellant groups together points of error one through six.

With admirable candor, the Appellant, at the outset of its statement and argument, writes in its brief:

"At the outset, we candidly admit that the procedure adopted by appellant in handling the repossession of the van is not recommended as standard operating procedures for use by secured creditors. Under this record, appellant did not comply with either of the alternative provisions of Chapter 9 of the Business and Commerce Code. *See Secs. 9.504(c) and 9.507(a), TEX.CODES ANN.BUS. & COM. CODE* [Sic] (1985 Supp.)."

The bank further concedes, in its brief:

"... The amount of the debt stands undisputed in our record. It was the precise sum which was deducted from her account: $3,474.41."

Alice Karnes was a co-maker. The bank had taken possession of the 1974 Ford Van and *had not disposed of it at the time of trial.* The bank's acts of taking the security; that is, the van, and keeping possession

thereof for the long duration of time, being May of 1979—repossessed by Larry E. Risinger, an Officer of the Bank—to July 9, 1984, the date of trial, defeated the banks's right to offset. By the bank choosing this legal election, it brought about a complete satisfaction of the balance of the debt. We find the actions of the Bank resulted in more than a breach of contract. We find the amount of compensatory damages was $3,474.41. We find $3,474.41 as a matter of law as well as by stipulation. After reviewing the record, and applying the well-established standards of appellate review, we overrule Points of Error One through Six. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Potter v. Garner*, 407 S.W.2d 537 (Tex.Civ.App.—Tyler, 1966, writ ref'd n.r.e.); Calvert, " '*No Evidence' and 'Insufficient Evidence' Points of Error*", 38 TEXAS L.REV. 361 (1960); Garwood, "*The Question of Insufficient Evidence on Appeal*", 30 TEXAS L. REV. 803 (1952).

▉ The eighth point of error contends that the trial court erred in overruling the Appellant's motion for mistrial because of certain prejudicial remarks made by a prospective juror during the voir dire examination. The juror did make statements that he, in the past, had dealings with the bank, or its officers, and that would influence his decision. He did, also, state that he could be fair. He expressed an opinion that he knew what had happened. Later on, however, in answer to a subsequent question, the juror agreed that the facts of the case on trial might be totally different.

The thrust of error eight is that the remarks were so prejudicial and inflammatory as to contaminate the whole jury panel and the whole panel should have been quashed. We do not agree. We do not perceive error, when we review the entire voir dire questions and responses concerning this one venireman.

On this point of error, the Appellant cites *A.J. Miller Trucking Company v. Wood*, 474 S.W.2d 763 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.). In that case, the jury panel was asked by plaintiff's counsel if any jurors had been employed in adjusting claims or had written insurance or had been connected with the insurance industry. We sanguinely hold that *Wood, supra*, is distinguishable and different. It is not controlling of this case.

▉ Concerning point of error eight, the Appellant's attorney did not timely object to the panel members' answers when they were made. Nor was there a request made to the trial court to instruct the entire panel to disregard the veniremen's answers. Because of the failure to object timely and because of the failure to request an instruction from the court to the panel to totally disregard the venireman's answers, this issue was waived. Moreover, there is no showing that the statements of the venireman influenced the other members of the panel to such a degree that an improper verdict resulted.

The bank failed to give the Karneses credit for the value of the van and the bank continued to retain possession of the van as well as the $3,474.41. We hold that the bank waived its right of offset by failing to reasonably dispose of the van in a manner that was a reasonably commercial one. This was required by *TEX. BUS. & COM. CODE ANN. Sec. 9.505* (Vernon Supp. 1986).

▉ If the bank, or any secured creditor, retains collateral for the length of time, as was done in this case, such secured creditor is not entitled to recover deficiencies. Since the bank retained the collateral, it, by operation of law, elected to take the collateral in full satisfaction of the debt. *See Tanenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769 (Tex.1982). *TEX. BUS. & COM. CODE ANN. Sec. 9.504* (Vernon Supp.1986) provides, in substance, that a secured creditor may dispose of the collateral after default. However, every aspect of this disposition must be commercially reasonable. This includes—within the concept of being commercially reasonable—the method, manner, time, place and terms of such disposition. We

find the bank failed to make the proper efforts, under *Sec. 9.504(c)*.

After the $3,474.41 was debited, there is some evidence to the effect that this debit was concealed from the Karneses. The evidence tends to show that after the debit was made, there was a conversation between the bank officer and Mr. Karnes. Yet, there was no mention made that the balance of David's and Alice's promissory note had been taken out of the savings account. Even after the money was taken from the savings account, none of the Karneses received a certificate of title to the van.

Later on, the Appellees employed one John M. Cely, an attorney at law, of Lufkin. He had practiced law 15 years. He went to the bank to investigate the matters involved in this litigation and had a conversation with the bank's officer. He especially wanted to inquire if the van had been sold and what credits had been given, if any. Apparently, there were two conversations between Cely and the officer. Cely maintained that the Karneses had not received the original title. The record fails to show that the Appellant bank ever made a good faith effort to give to either the Appellees, or their son, David, an accounting of its actions involving the savings account, or its actions, or inactions, concerning the van in question. There is some evidence of probative force that tends to show conscious fraud and intentional concealment. At least these were jury issues.

■ The bank relies heavily on *A.L. Carter Lumber v. Saide*, 140 Tex. 523, 168 S.W.2d 629 (1943). The Appellant quotes from *A.L. Carter Lumber Co.*, 168 S.W.2d at page 631, as follows:

"... The rule in this State is that exemplary damages cannot be recovered for a simple breach of contract, where the breach is not accompanied by a tort, even though the breach is brought about capriciously and with malice. [citations omitted]...."

The *A.L. Carter Lumber Co.* case was decided in 1943, long before *TEX. BUS. & COM. CODE ANN., sec. 9.504* and *9.507*

(Vernon Supp.1986). We determine that, under this record, it was not a simple breach of contract and the breach was certainly accompanied by a tort. The *Carter* case is clearly distinguishable. There, the lumber company told the purchaser, Mrs. Regina M. Saide, that it had declared a forfeiture for failure to meet monthly payments. Thereafter, the lumber company brought a forcible entry and detainer suit and the sheriff moved Mrs. Saide out of the house and lot involved. The lumber company gave full notice to Mrs. Regina Saide of their forfeiture and foreclosure and forcible entry and detainer suit. Mrs. Saide also had notice that the sheriff would remove her from the property. But, under the record subjudice, the bank concealed and did not disclose important facts and actions.

Because of the length of time that the Texas National Bank held the van, it lost the right of offset. We hold, under this record, that a conversion of the monies and the continued possession of the monies out of the savings account of Alice and Dewey Karnes, and the failure to deliver the certificate of title, and the concealments, were torts and were in the nature of tortious actions.

The Appellant bank also relies on *First National Bank of Schulenburg v. Winkler*, 139 Tex. 131, 161 S.W.2d 1053 (1942). But the *First National Bank of Schulenburg* case holds, in substance, that the right of offset which the bank has to offset the amount of the depositor's deposit against an equal amount of indebtedness which the depositor owes to the bank may be waived by the bank or may be overborne by the superior equity of a third person. The *First National Bank of Schulenburg* case is different and meaningfully distinguishable from our case.

In July of 1937, at about the beginning of the ginning season, one Winkler operated a cotton gin. A Mr. E.H. Pratka was engaged in the cotton business. They contrived a plan in accordance with which Winkler was to purchase cotton from his gin customers and resell that cotton to

Pratka. The bank knew about the plan and consented to it. Pratka, upon buying the cotton, was to deposit money into Winkler's account to cover Winkler's checks that were used to purchase cotton from the farmers who came to Winkler's gin. The Commission of Appeals, Section A, held that the plan which was devised by Winkler and Pratka was agreed to by the bank and that the plan comprehended (1) the giving of checks by Winkler to the farmers for their cotton; (2) the paying of the checks from the general checking account of Winkler; and (3) the depositing by Pratka, in Winkler's account of the amount of the purchase price which he was to pay Winkler for the cotton. The agreement, on the part of the bank, to these features of the plan necessarily implied, Commission A held, the exclusion of any right of the bank to divert the said cotton funds to the payment of any indebtedness due the bank by Winkler. The Commission further held that, in good conscience, the said cotton funds belonged to the (30) odd farmers. The court concluding 161 S.W.2d at page 1056:

> "... Regardless of the fact that said funds constituted a part of the general checking account of Winkler, the equitable claim of the farmers in respect to the funds, was superior to the bank's right of set-off. Steere v. Stockyards Nat. Bank, supra." [*Steere v. Stockyards Nat. Bank*, 113 Tex. 387, 256 S.W. 586 (1923)]

We hold here that Dewey Karnes' right, and also Alice Karnes' right, were superior to the bank's right of offset in view of the fact that the bank retained possession of the van and did not make a commercially reasonable disposition of the same within a reasonable time.

*TEX. BUS. & COM. CODE ANN. sec. 9.507* (Vernon Supp.1986) was passed by the Legislature in 1967. *Section 9.504(c)* has had several amendments, being effective beginning with January 1, 1974, through August 29, 1977. The sections were enacted subsequent to both the *A.L.* *Carter Lumber Co., supra*, and *First National Bank of Schulenburg, supra*.

## McCUISTION'S BACKGROUND

Mr. Terry Paul McCuistion was called to the stand. He was a banker by profession, having worked for national or state banks for about 13 years. His educational background was high school graduate, four years in college, and having taken various banking courses and also banking seminars. He attended other numerous educational courses in banking, including American Institute of Banking classes at SFA, which we assume is Stephen F. Austin University. He received a bachelor's degree from LSU in Baton Rouge, Louisiana. One of his normal duties was as a management trainee for a large bank in Shreveport, Louisiana. During that training program, he went through the different areas of the bank learning all the various functions of that half billion dollar bank in Shreveport.

After a year at the large bank, he went to a smaller bank in the same town where he performed the duties of assistant manager and loan officer. He worked for the smaller bank 7½ years. He had become the manager of the bank for about the last 3 years of the 7½ years. Later, he came to Lufkin. He was president of the Texas National Bank. Later, he went to the First City National Bank where he served for 3½ years as a commercial lending officer. His present duties at the First City National Bank include making loans, collecting loans and processing loans. He handles customers' accounts. He also takes care of past due accounts and notes and obligations to the bank. He has had many experiences in the past in the disposition of collateral for loans.

## THE EXPERT'S TESTIMONY

The trial lawyer for the bank affirmatively said that he did not have any objections to the fact that the Appellants were qualifying this banker as an expert. Mr. McCuistion definitely qualified as a banking expert. He examined Plaintiffs' Exhibit No. 1, which was a type of promissory

note used in current banking. McCuistion testified that ofttimes, in the regular course of banking procedures, a bank does have to take possession of the collateral when the note becomes delinquent. He testified that he knew what was the accepted practice in dealing with repossessed collateral in the banking industry. McCuistion testified, in substance, that a bank must dispose of the collateral in a reasonable manner, establishing value from an outside, independent, source as to what the particular collateral is worth; that the bank must try to sell the collateral as close to the market value as possible, exercising prudent actions and taking prudent bids. As to vehicles, the banks, as common practice, try to take the vehicles to several car lots to see what the car lots will give for the collateral.

If the car is in driveable condition, the bank will try to sell it at retail. First, banks advertise in the newspapers. Secondly, they also ask their customers who come into the bank for bids. After a period of time, a prudent duration being 30 days or so, if the collateral has not been sold, then the proper course for banks is to take the collateral back to one of the car lot dealers that gave the highest bid on the vehicle.

Hopefully, the bank will try to get the amount of money that is against the loan and apply that against the loan to pay off the note in full. If the bank cannot get the amount of the note and there is an insufficiency, then the Bank asks the note maker to pay. the balance due to the bank. McCuistion definitely testified that it was not accepted banking practice to hold collateral for 4 or 5 years especially if the collateral is a vehicle. Because of the depreciation factor, a bank should try to make a reasonable disposition of the collateral as quickly as reasonably can be done.

He testified that, normally, the bank advises the customer what it is trying to do in disposing of the collateral. The usual banking practice was to write the customer or debtor what McCuistion called a "ten-day letter that states, 'That you have ten days from the date of this letter to pay your loan off or we will be forced to re-posses [sic] your collateral.'" After taking repossession, the bank usually holds the collateral for ten days to give the customer ten days to come in and pay off the note and obtain possession of the vehicle. However, at the end of ten days, according to ordinary and accepted banking practices, the collateral is considered the bank's and the bank will dispose of it—but always in a prudent manner. He was asked:

"Q. All right. What is the result if you retain the collateral and don't try to sell it?

"A You eat the loss, usually.

. . . .

"Q Under the banking practice, is it not also the law that's been made available to you, that the collateral—— that you try to sell?

"A You have to establish what your loss is.

"Q Before you can go anywhere else?

"A Right. To know what to sue them for and what deficiencies there are left. . . .

. . . .

"Q Let me back up and I will just ask you this: As far as a banking account, checking account, savings account, do you, when you make a transaction on that and when they are not a party to it, do you quickly advise them of that transaction?

"A Yes, sir.

"Q And why?

"A Well, you could be liable for any damages that they might sustain for not knowing that information.

. . . .

"Q All right. If it were a savings account, you would still, would you not, as a custom of the banking industry, advise them if you ever do take any funds out?

"A *Yes. You would take it out, but you would notify them at the same time that you have done this and*

*what action you did and where the money went.*

"Q All right. Also, send them something showing that, would you not?

"A Right. If you pay the note off entirely with a checking account by right of offset, as the term is used, then, generally you would send them a paid note because you paid their loan out.

"Q And if this is a vehicle involved, you would send them a released title, do you not?

"A Yes, sir, if you have got enough money in the savings account, but generally, like I said, you would try to dispose of the collateral first, to establish what the loss is. The only time you wouldn't is if in the case where you thought the people were about to skip out on you, run out on you.

. . . .

"Q You have to establish the loss, do you not?

"A Right." (Emphasis added)

And, of course, there is other evidence in the case. McCuistion was skillfully cross-examined. The weight, credibility, believability and truthfulness of his testimony was for the jury. McCuistion was subpoenaed. We find separate and independent tortious conduct and a tort under this record.

## SUMMARY

In summary, the van was repossessed in May, 1979. The $3474.41 was deducted from the savings account in July, 1979. Dewey and Alice Karnes found out about the deduction of the money from their savings account in December—probably on December 22, 1979. The bank had possession of the van at the time of trial, being July 9, 10, and 11, 1984.

▪ We hold the following to be torts, or certainly of a tortious nature, on the part of the bank:

1. In failing to make a reasonable disposition of the collateral;

2. In keeping possession of the collateral beyond a reasonable time;

3. In taking or converting the money out of the savings account after losing its right to offset;

4. In failing to timely notify Dewey and Alice of the deduction from their savings account;

5. In concealing the fact from Dewey and Alice that the bank had deducted from their savings the sum of $3,474.41 for the period of time from July, 1979, to December, 1979;

6. In failing to return the certificate of title to the van while holding possession of the van from May, 1979, to July, 1984; and,

7. In failing to establish the value of the collateral in a commercially acceptable manner and within a reasonable time after repossessing the same.

We hold each of the above, enumerated acts or omissions is a separate and independent tort—each being certainly more than a simple breach of contract.

As a separate and distinct basis for our holding, justifying some exemplary damages, we conclude and determine that these acts or omissions, viewed and weighed cumulatively, formed separate and independent torts. Cumulatively, these actions were more than a simple breach of contract. Hence, we sanguinely conclude that the jury's award of *some exemplary damages was proper.* Of course, there exists conflicting evidence on several of the above enumerated matters, but we perceive that, at least, jury issues were raised.

Based on this record, we affirm that part of the judgment that Dewey J. Karnes and wife, Alice E. Karnes, recover $3,474.41 from the Texas National Bank of Lufkin, with interest thereon from July 3, 1979, at the rate of 6% per annum until the date of the judgment, which was January 29, 1985. Thereafter, post judgment interest accrues from the date of the judgment at the rate of 10% per annum until paid.

We sustain the jury's answers to each and every special issue except Special Issue No. 3.

We affirm that part of the judgment allowing the $7,627.50 attorneys' fees through the trial in the district court. We affirm the attorneys' fees, through the Court of Appeals, in the amount of $2,000.00. The attorneys' fees will recover interest, being post judgment interest, at the rate of 10% per annum from the date of the judgment until paid. However, we disagree with the trial court's finding that all of the attorneys' fees, as found by the jury's answer to Special Issue No. 6, are to be considered as an element in measuring punitive damages under this record. We conclude to the contrary. In this case, the attorneys' fees are in the nature of compensation rather than damages.

In answer to Special Issue No. 3, the jury awarded $50,000 for punitive damages. After reading, analyzing and considering the entire record in this case, and especially in view of the fact that Mrs. Alice Karnes also signed the note, we find that $50,000 is excessive. We affirm, however, an award of $20,000, but no more, as punitive or exemplary damages in this case. The $20,000 for punitive damages is to receive post judgment interest at the rate of 10% per annum from the date of the judgment until paid.

The Appellees, Dewey Karnes and wife, Alice Karnes, are given 14 days from the date of this opinion to file a remittitur in the amount of $30,000. If they file a proper remittitur timely, then the judgment is, and will be, reformed and, as reformed, affirmed. If, however, they fail to file such timely remittitur, then the judgment of the trial court is reversed and the cause is remanded for new trial.

The judgment is reformed and, as reformed, affirmed.

REFORMED AND, AS REFORMED, AFFIRMED.