**J. S. HUDNALL, Petitioner,**

v.

**TYLER BANK AND TRUST COMPANY, Respondent.**

No. B–1961.

Supreme Court of Texas.

July 15, 1970.

Rehearing Denied Oct. 7, 1970.

Locke, Purnell, Boren, Laney & Neely, Eugene M. Locke and Stephen H. Philbin, II, Dallas, for petitioner.

Lawrence & Lawrence, F. Lee Lawrence, Tyler, for respondent.

CALVERT, Chief Justice.

Tyler Bank and Trust Company obtained a summary judgment against J. S. Hudnall in this suit on Hudnall's promissory note executed in favor of the bank. Hudnall appealed, and the Tyler Court of Civil Appeals affirmed. 448 S.W.2d 503. We reverse and remand.

Hudnall responded to the bank's suit with a general denial, a plea of failure of consideration, and a cross-action. The predicate for the cross-action and the affirmative defense is the same, viz., that the bank allowed the misapplication of the proceeds of the note sued upon, in violation of an express oral agreement to hold the funds for the special purpose of completing construction of the Mother Frances Hospital.

■ Hudnall's theory of the transaction is that when he signed and delivered the note and obligated himself to pay it, the bank, in return, (1) furnished the funds representing the amount of the note, and (2) promised to control the use of those funds. In other words, there was only one contract, with two elements of consideration on the bank's side. In our view, there is in the record neither pleaded facts nor summary judgment evidence supporting Hudnall's claim of failure of consideration. The agreement upon which the defense is based and which the bank strongly contends never existed, is collateral to the note contract. Cf. E. E. Farrow Co. v. United States Nat. Bank of Omaha, 358 S. W.2d 934 (Tex.Civ.App.—Waco 1962, writ ref'd n. r. e.). And see Southern Pacific Co. v Porter, 160 Tex. 329, 331 S.W.2d 42 (1960); Morris-Buick Co. v. Davis, 127 Tex. 41, 91 S.W.2d 313 (1936). But although collateral, its breach, if proved, would support a cross-action by Hudnall for damages and a set-off of such damages against any amount recovered on the note. See Hubacek v. Ennis State Bank, 159 Tex.

166, 317 S.W.2d 30 (1958). Hudnall does not by his cross-action seek a judgment for damages in an amount greater than the sum due on the note; he seeks recovery of only such an amount as will bar or reduce a recovery on the note.

The summary judgment rendered by the trial court did two things, viz.: (1) it awarded the bank a full recovery on the note, and (2) it directed that Hudnall take nothing by his cross-action. Hudnall has not expressly attacked the judgment in so far as it directs that he take nothing on his cross-action, either in the court of civil appeals or in this court; and yet, the only valid defense to the note he has pleaded and sought to prove is available to him solely by way of his cross-action. However, Hudnall has attacked the summary judgment in favor of the bank on the ground that there is summary judgment evidence to support his claim of breach of the collateral agreement, and we will treat his points of error and argument thereunder as an incidental attack on the summary judgment directing that he take nothing on his cross-action.

The court of civil appeals found from the summary judgment proof that even if there was an agreement as alleged by Hudnall, it was rescinded when Hudnall later allowed the funds to be deposited to a general account. Hudnall complains of each of the two aspects of this holding in appropriate points of error,[1] asserting that affirmance of the summary judgment was error because the summary judgment evidence raised genuine issues of material fact both as to the existence of an agreement that the proceeds of the note would be limited and controlled by the bank for use in construction of the Mother Frances Hospital, and as to whether that agreement was ever rescinded.

The record shows that Hudnall is a partner in a petroleum engineering firm, but

---

1. The court of civil appeals also found as a matter of law that the bank owned the note. That matter was contested in the trial court under Hudnall's general denial, but the holding of the appellate court is not questioned here and so passes out of the case.

for over thirty years prior to this suit he had also been a director of the plaintiff Tyler Bank and Trust Company; for a time he was chairman of the bank's board of directors; and for many years he had served either as a member of or an advisor to the bank's Loan and Discount Committee. Hudnall pleaded that he was induced by J. Harold Stringer, president of the bank, to issue the original of the renewal note sued upon, in order to make $160,000.00 available to Clanahan Construction Company; that the plan was for Hudnall to execute and deliver his unsecured promissory note, bearing interest at 6 percent, to the bank, and at the same time Clanahan through its president, John W. Hardin, would execute and deliver its note for the same amount and at the same rate of interest to Hudnall, with Clanahan paying the interest on both notes; and that the purpose of the plan was to allow Clanahan to show the requisite financial strength to qualify it for a performance bond necessary for undertaking the Mother Frances Hospital project.

Hudnall then pleaded that after he had proceeded with the plan upon an express oral agreement with Stringer that the bank would hold the proceeds of the note for the sole purpose of "guaranteeing" the completion of the hospital job, the bank not only failed to control the proceeds' disbursement, but also collusively acted with Hardin to effect the immediate and unauthorized use of the funds.

Depositions are in the record containing the testimony of Hudnall, Hardin, Stringer, and Pounds (Chairman of the Board of the bank). The testimony of Hudnall, sharply conflicts with that of the others. If upon a conventional trial of the case the same testimony should be offered, the credibility of all of these persons as witnesses would be in issue. In our review of the summary judgment proofs, however, we must accept the testimony of Hudnall as true, and indulge every reasonable inference in favor of his position. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.

2d 929 (1952). We must apply yet another summary-judgment rule of review owing to Hudnall's assertion of his cross-action as an affirmative defense. Because the bank showed as a matter of law that it was entitled to recover on the note, Hudnall, in order to avoid a summary judgment, had the burden of showing that issues of fact existed as to his cross-action. The rule, as stated in Gulf, Colorado & Santa Fe Railway Co. v. McBride, 159 Tex. 442, 322 S.W.2d 492, 500 (1959), is that—

"Where the plaintiff moves for summary judgment in an action in which the defendant has pleaded an affirmative defense, he is entitled to have his summary judgment if he demonstrates by evidence that there is no material factual issue upon the elements of his claim, unless his opponent comes forward with a showing that there is such a disputed fact issue upon the affirmative defense."

Hudnall testified that he told Stringer of the use to be made of the proceeds of the note and that the funds put up would be limited to the guaranteeing of the completion of the hospital. According to Hudnall, Stringer assented to the restrictions placed upon the funds. The bank contends that this testimony shows nothing more than that Hudnall related to Stringer the details of Hudnall's arrangement with Hardin. Undeniably, a jury might ultimately agree with the bank's contention, or it might decide that the testimony showed only Hudnall's "understanding" rather than an agreement. We think, nevertheless, that this testimony just as reasonably infers the existence of an agreement. Thus, to this point, the summary judgment proof raises the necessary issue of fact.

The court of civil appeals was of the opinion that the testimony discussed above is not dispositive of the matter, but that the crucial point of inquiry is whether the funds actually were placed at Hudnall's direction into Clanahan's general account rather than into a special account. In this regard, we think that the court of civil appeals has taken a proper approach based

upon a correct view of the law, although we differ with that court's ultimate conclusion that only one reasonable inference can be drawn from the evidence.

■ Neither the Texas Banking Code of 1943,[2] the Uniform Commercial Code,[3] nor other Texas statute appears to treat the subject of general and special deposits in banks. Certain rules of law however, have long been established:

"When money or its equivalent is deposited in a bank without any special agreement, the law implies that it is to be mingled with the other funds of the bank, the relation of debtor and creditor is created between the bank and the depositor, and the deposit is general. In such a transaction the bank becomes the owner of the fund. When, on the other hand, money or its equivalent is so deposited with an accompanying agreement that the identical thing deposited shall be returned, or that the same shall be paid out for a specific purpose, the relation thus created is not that of debtor and creditor. Such a transaction is a special deposit, and the bank is liable only as bailee. In such a case the fund is a trust fund, the bank acquires no title thereto, and is a mere trustee for the safe-keeping, return, or disbursement of the fund, according to the special contract by which the deposit is made." McBride v. American Ry. & Lighting Co., 60 Tex.Civ.App. 226, 127 S.W. 229 (1910, no writ).

We also approve the principle stated in the court of civil appeals' opinion that where a depositor gives the bank the right to commingle his deposit with other funds owned by the bank, he creates only a general deposit whose funds the bank is authorized to use and disburse as it sees fit. Security Nat. Bank Savings & Trust Co. v. Moberly, 340 Mo. 95, 101 S.W.2d 33 (1936). Hud-

nall himself, in his pleadings, recognized that showing a special deposit of the funds was essential to his defense, although on appeal to this court he has taken another position. He pleaded that the deposit as accepted by the bank was "for a specific, special, limited and particular purpose" (i. e., by definition, a deposit to a *special account*), but that the bank instead deposited the funds "in the unrestricted, *general checking account* of Clanahan Construction Company * * * and commingled the said funds with funds of Clanahan Construction Company, thus making said funds available for a use * * * not in accordance with the terms of the agreement * * *."[4]

■ In support of its holding that "if a bailee or trustee relationship ever existed, the undisputed evidence shows it was rescinded" the court of civil appeals quoted portions of Hudnall's deposition testimony, as follows:

"Q. Would you describe the events that took place between you and Mr. Hardin and the Bank on that occasion?

"A. Yes, when I got there, as I say, I did not see Mr. Hardin, and I went directly into Mr. Stringer's office and when I got in the office, I started discussing this deal again with Mr. Stringer. And I again went over the fact that any money that I put up with reference to this deal would have to be limited to the guaranteeing of the completion of the hospital and that alone—even mentioned the fact that I could not, of course, guarantee Mr. Hardin to make any profit. And when I made this agreement, this oral agreement with Mr. Stringer, and I said, 'You understand that this is the way that the deal has to be made?' He says, 'Yes.' I then executed this Note which he had made out or which he made out during the course of our con-

2. Vernon's Ann.Tex.Rev.Civ.Stat. art. 342.

3. Tex.Bus. & Commerce Code, §§ 1–9, V.T.C.A.

4. Emphasis supplied.

versation, and handed it to me, and I signed it. About the time that the Note was signed, Mr. Hardin came in. It could have been a half minute before it was signed. It could have been a minute after. I couldn't pin it down that close, because I had no reason to try to do it. And when Mr. Hardin came in, why he had—he either made out right at that time, the note of $160,000.00 payable to me on demand and carrying the same terms as the Note which I had just executed to the Bank. And then Mr. Stringer says, 'Now, do you want me to put this money in Mr. Hardin's account?' and I said, 'Yes.' Of course, assuming that he would carry out the oral agreement which we had had just three minutes before, that the money would be restricted to the guaranteeing of the completion of the Mother Frances Hospital. And Mr. Hardin gave me his Note and Mr. Stringer already had my note, and the deal was closed out and that was all there was to it.

"Q. Was that all that was said?

"A. That's all that was said that I have any memory of.

"Q. Do remember whether or not Mr. Stringer asked you if you wanted it in any kind of a special account?

"A. No, he did not.

"Q. Did not ask you that?

"A. No, he didn't mention that. He asked me if I wanted it to go into their account, and I said, 'Yes', and that was all that was said with reference to accounts.

"Q. By accounts, you said put it in—

"A. Clanahan Construction Company's.

"Q. All right, you said John Hardin's account, you meant Clanahan Construction Company account.

"A. Clanahan Construction Company's account.

"Q. Now, who asked you about that?

"A. Mr. Stringer. And he put it in there. I didn't.

"Q. Well, upon whose authority did he put the $160,000.00 in the Clanahan Construction Company account?

"A. Well, I had authorized him to.

"Q. So it was upon your authority?

"A. I would assume so.
*   *   *   *   *   *

"Q. Didn't you direct Mr. Stringer to put it in John's account?

"A. Yes.

"Q. But you didn't say in a special account?

"A. No.

"Q. Did you have any agreement with Mr. Stringer or the Bank that it was to go into a special account?

"A. No.
*   *   *   *   *   *
"Q. What did you mean by the guaranteeing of the completion of the hospital?

"A. The money was to be used in case Mr. Hardin or the Clanahan Construction Company had to have it to finish up if they did get into a tight, a financial tight, and could not finish it, that the money would be available to them."

If the testimony above were *all* of Hudnall's testimony on the matter, we would be inclined to agree with the court of civil appeals. But there was more to what Hudnall said, and we quote it below:

"A.  *  *  *  [The note] was signed with the agreement that the money would be—and that Note itself would be restricted to the. guaranteeing of the completion of that hospital and that alone. Now, that was the terms and the agreement that I had with Mr. Stringer before I executed the Note, and I wouldn't have

executed it without me understanding that that was the way the deal was to be carried out.

"Q. If the money was going into Clanahan Construction Company's account and you knew that it was going into there, then how would you have considered it practical or even possible for Mr. Stringer to have policed that account to determine the withdrawals on that account, which were made by Mr. Hardin?

"A. Well, I am not a technical loan officer, and I do not know all of the ways and means of doing that. I depended entirely upon Mr. Stringer to do whatever was necessary to carry out the agreement which I had with him.

"Q. But you are a man with considerable banking experience, having been everything from a Director to Chairman of the Board of a Bank and have sat on their Loan Committees and Board of Directors for thirty odd years, now how did you envision that Mr. Stringer would be able to police such an arrangement?

"A. I did not concern myself even with it, because I knew there were ways that it could be done and I assumed the Bank would do that.

"Q. Do you now have any ideas as to how he could have done it?

"A. Well, not in the form of detailed bank procedure. I know that they have various ways of doing it, and that they can put the whole account under a controlled account, or they can—

"Q. But you knew this didn't go into a controlled account, didn't you?

"A. No, I didn't know whether that was a controlled account or not. Sure didn't.

"Q. You didn't know whether it was a controlled account or not?

"A. That's right. I didn't concern myself with it. I only concerned myself with the agreement that I had with the President of the Bank when I took the loan.

"Q. Well, if it didn't go into a controlled account, is there any practical way, or is there any possible way it could be controlled?

"A. Well, all I can say is that banks have tremendous control over a lot of things. They may not all be legal, but they sure can control it.

"Q. Do you know any way they could have controlled this?

"A. Yes, I think they could have refused to let Hardin spend any money out of it.

\*    \*    \*    \*    \*    \*

"Q. How would the Bank determine some way to maintain a $160,000.00 separate from any obligations except those on this particular job?

"A. As I say, that is entirely a detail in banking procedure that I don't claim to know a great deal about. And I did not depend upon my knowledge for that.

"Q. Are you saying it was your arrangement with Mr. Stringer that this money would be held in the account available only in the event that Hardin was unable to complete the contract out of his own resources?

"A. Well, in effect, that was my understanding.

"Q. Or are you saying that this money was to be available only for the Mother Frances job?

"A. Both. I would say that it was to be used only for the Mother Frances job and then only when he couldn't complete it without the use of it.

"Q. In other words, it was your understanding that your agreement with the Bank was that he was not to use any of this money during the course of construction of the Mother Frances job

unless he was unable to complete the job without it?

"A. That's right. That is exactly what I tried to make very clear and which the oral agreement was.

"Q. All right, sir. You allege in paragraph four of your Petition by way of cross action, paragraph two, page eight, that the cross defendant has disregarded and violated its agreement with you to hold the proceeds of the Note sued upon by the Bank in a special account for the use by Clanahan. There never was any agreement, was there, Mr. Hudnall, that it would be placed in a special account?

"A. There was no agreement as to how it would be done. The agreement was it would be done; but as to how, there was no discussion on it.

"Q. But you knew that it didn't go into a special account, didn't you?

"A. No, I didn't. No, I didn't know but what it was a special account when it went into it.

*    *    *    *    *    *

"Q. And you didn't know at the time that it didn't go into a special account?

"A. No, I sure didn't. That could have been a special account just as easy as the other. There was nothing mentioned as to what kind of account it was."

This testimony obviously is conflicting. Considering the entire testimony, particularly Hudnall's testimony that he did not concern himself with the mechanics of the banking procedures involved and that he relied on the president of the bank to take whatever action was necessary to control the use of the funds, we are of the opinion that a jury would be authorized reasonably to infer that Hudnall did not assent to a general deposit of the funds. The opposite inference could as easily and reasonably be drawn. But with opposing inferences possible, an issue of fact has been raised, and Hudnall has thereby successfully raised his affirmative defense in opposition to the motion for summary judgment.

We sustain both points of error, and accordingly reverse the judgments of the courts below and remand the cause to the trial court for further proceedings consistent with this opinion.