CITIZENS FIRST NATIONAL BANK OF
TYLER, Petitioner,

v.

CINCO EXPLORATION COMPANY,
Respondent.

No. B–5738.

Supreme Court of Texas.

July 7, 1976.

Rehearing Denied Sept. 29, 1976.

Ramey, Flock, Hutchins, Garinger & Jeffus, Mike Hatchell, Tyler, for petitioner.

Prappas, Caldwell & Moncure, Brantly Harris and Tommy D. Solomon, Houston, for respondent.

McGEE, Justice.

Cinco Exploration Company brought this suit against Citizens First National Bank of Tyler for the sum of $30,000 which Citizens Bank allegedly wrongfully disbursed contrary to Cinco's written instructions. Both Cinco and Citizens filed motions for summary judgment. The trial court granted Citizens' motion and rendered judgment that Cinco take nothing. The court of civil appeals reversed and remanded the case for a trial on the merits. 529 S.W.2d 852. Both Citizens National Bank and Cinco Exploration Company filed applications for writ of error. We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

On November 9, 1973 Cinco Exploration Company entered into a letter agreement with Paul B. Goodgame and S. Harry Bergman by which Goodgame and Bergman agreed to assign an oil and gas lease to Cinco. The pertinent provisions of this letter agreement read as follows:

"1. Messrs. Paul B. Goodgame and S. Harry Bergman are the owners of a certain Oil, Gas and Liquid Hydrocarbon Lease dated June 15, 1973. . . .

"2. Goodgame and Bergman agree to assign to Cinco Exploration Company the lease described in Article 1 of this agreement, . . .

"3. Messrs. *Goodgame and Bergman will exercise their best efforts* on or before Nov. 18, 1973, *to obtain full execution of the amendments* shown as Exhibits 'A' and 'B' of this agreement and made a part hereof, to an Oil, Gas and Liquid Hydrocarbon Lease.

"4. *Upon delivery of the assignment* referred to in Article 2 of this agreement, *and upon the receipt of satisfactory evidence by Cinco Exploration Company of acceptance* by the Cameron Minerals Group *of the lease amendments* shown as Exhibit 'A' and 'B' of this agreement, *Cinco shall pay* to Paul B. Goodgame and S. Harry Bergman, jointly, *the cash sum of $30,000.00.*" [Emphasis added].

In essence, this agreement provided that Goodgame and Bergman would use their best efforts to obtain two amendments to the lease to be executed by the lessors. Upon receipt by Cinco of satisfactory evidence that the lessors had agreed to the two amendments, Cinco was to pay Bergman and Goodgame $30,000. On November 16, 1973 Goodgame and Bergman executed the lease assignment assigning the lease to Cinco and attached to the assignment a documentary draft upon Cinco for $30,000 which they placed for collection with Citizens First National Bank of Tyler. Citizens forwarded the draft to its correspondent American Bank of Commerce of Victoria for presentment and collection. On November 19, 1973 American Bank received the documentary draft and presented it to Cinco for payment. Cinco informed American Bank that the draft was not in compliance

with the letter agreement Cinco had entered into with Bergman and Goodgame. Cinco told American that the two lease amendments were not enclosed with the documentary draft and that Cinco had not yet received any other evidence that the lessors had accepted the two lease amendments. On November 20, 1973, acting pursuant to Cinco's instructions with funds supplied by Cinco, American Bank wrote a letter to Citizens Bank. Enclosed with the letter was a cashier's check payable to Citizens in the sum of $30,000 together with a copy of the November 9, 1973 letter agreement entered into between Cinco, Bergman, and Goodgame. The letter from American Bank addressed to Citizens stated as follows:

"Citizens First National Bank
P.O. Box 2020
Tyler, Texas 75701
Gentlemen:
*Enclosed is a Cashier's Check for payment of your site* (sic) *draft dated* November 16, 1973 *payable to* Mr. Paul B. Goodgame and Mr. S. Harry Bergman pursuant to article eight of the letter agreement dated November 9, 1973 between Mr. Goodgame, Mr. Bergman and Cinco Exploration Company (copy enclosed). *Your payment is contigent* (sic) *upon performance of all other articles* of the letter agreement and will constitute an unreserved acceptance of the lease assignment upon performance of all articles in the subject letter agreement, *including, but not limited to the* execution of the lease amendments A and B indicated in article four of the letter." [Emphasis added].

Upon receiving this letter and the cashier's check from American Bank, Citizens inquired of Bergman whether he had done everything that he was supposed to do under his letter agreement with Cinco. Upon receiving an affirmative answer, Citizens deposited the $30,000 to the account of Goodgame and Bergman. On January 18, 1974 American Bank's attorney wrote Citizens stating that Bergman and Goodgame had failed to furnish Cinco with the two lease amendments as required under the

November 9, 1973 letter agreement. American's attorney returned the lease assignment executed by Bergman and Goodgame and demanded the return of the $30,000 Citizens had paid to the account of Bergman and Goodgame. When Citizens refused, Cinco instituted the present suit against Citizens on March 27, 1974.

Before us, Citizens asserts that we should uphold the trial court's action in granting a summary judgment in its favor. Conversely, Cinco argues that its own motion for summary judgment should have been granted. Cinco contends that when Citizens accepted the $30,000 cashier's check and undertook disbursement in accordance with American's letter of transmittal, Citizens became an agent of Cinco as a matter of law. As a result, Cinco asserts that Citizens had a duty to follow all of the instructions contained in American's letter of November 20, 1973. Thus, Cinco argues that by its failure to require Bergman and Goodgame to furnish the two lease amendments *or* satisfactory evidence that the amendments were accepted by the lessor, Citizens breached its duty as Cinco's agent and became liable to Cinco as a matter of law. On the other hand, Citizens contends that summary judgment was properly rendered in its favor. Citizens argues that no agency relationship existed between it and Cinco; therefore, it owed no duty, and breached no duty, to Cinco. Alternatively, Citizens has also argued that if it owed a duty, the summary judgment proof shows it discharged its obligation to Cinco. The summary judgment entered in favor of Citizens is appropriate only if the record establishes a right thereto as a matter of law. It is well established that a defendant moving for a summary judgment assumes the burden of showing as a matter of law that the plaintiff had no cause of action against him. *Gaddis v. Smith*, 417 S.W.2d 577 (Tex.1967). Thus, the question becomes whether Citizens' summary judgment proof established as a matter of law that there was no genuine issue of material fact as to one or more of the essential elements of Cinco's cause of action. *Gibbs v. General Motors Corporation*, 450 S.W.2d 827 (Tex.1970); *Torres v.*

*Western Casualty and Surety Company*, 457 S.W.2d 50 (Tex.1970).

■ The court of civil appeals found the creation of a "special deposit" between Cinco and Citizens. A "special deposit" is the traditional designation of the bailment or agency or trust whereby the bank keeps or transmits identical property or funds entrusted to it. The usual creditor-debtor relationship does not arise. *Hudnall v. Tyler Bank and Trust Company*, 458 S.W.2d 183 (Tex.1970). In order for a "special deposit" situation to exist, there must be an agreement between the depositor and the bank upon the use of deposited funds for a specific purpose. *See, First State Bank & Trust Co. v. First Bank of Truscott*, 32 S.W.2d 494 (Tex.Civ.App.—Eastland 1930, writ ref'd). It must be shown that the bank agreed to the obligation. However, if the agreement of the bank is to be *implied* by its acceptance of a deposit accompanied by written limitations imposed by the depositor, "*the writing should set forth by clear direction what the bank is required to do.*" *Citizens National Bank v. Hill*, 505 S.W.2d 246, 248 (Tex.1974) [Emphasis added]. In the case now before us, the court of civil appeals stated:

> "[I]t is without dispute that Citizens accepted Cinco's funds and disbursed the same to Bergman and Goodgame. Therefore, Citizens will be held to have *impliedly consented* to Cinco's proposal as set forth in American's letter of November 23, 1973 (sic)." 529 S.W.2d 852, 856. [Emphasis added].

The court of civil appeals also concluded that the terms of the letter of November 20, 1973 which American forwarded to Citizens were ambiguous and that fact questions were presented as to the intention of the parties. Thus, the court held that summary judgment had been improperly rendered in favor of Citizens.

We do not agree that this controversy involved the creation of a "special deposit." It was not Cinco who instituted the collection process which ultimately culminated in this lawsuit. The action taken by Cinco in forwarding the $30,000 cashier's check to Citizens was in response to the collection effort earlier initiated by Bergman and Goodgame. It was these two individuals who mounted the initial collection effort by placing a documentary draft with Citizens Bank for collection. However, we do believe that the fact situation presently before us is, in certain respects, so closely analogous to the creation of a "special deposit" as to call for the application of similar tests. Assuming the November 20, 1973 instructions from Cinco were intended to be controlling of Citizens' actions, there is nevertheless no evidence of any express agreement on the part of Citizens to comply with Cinco's directives. As a result, if we are to imply the existence of Citizens' agreement by virtue of its acceptance of the $30,000 along with the written instructions, the instructions must set forth by clear direction what Citizens was required to do. *See, Citizens National Bank v. Hill*, supra. Assuming Cinco's instructions were intended to govern Citizens' disbursement actions, did the letter "set forth by clear direction" what Citizens was required to do? We think not.

■ A documentary draft is defined as "any negotiable or non-negotiable draft with accompanying documents, securities or other papers to be delivered against honor of the draft." Tex.Bus. & Comm.Code Ann. Sec. 4.104(a)(6) (Tex. UCC 1968). Upon receipt of Bergman and Goodgame's documentary draft, Citizens' status became that of a collecting bank.[1] Sec. 4.105(4). Unless a contrary intent clearly appears, a collecting bank is the agent or sub-agent of the owner of the item prior to the time that a settlement given by the collecting bank is or becomes final. Sec. 4.201(a). Thus, from the inception of this controversy, Citizens was the agent of Bergman and Goodgame. By virtue of its status as a collecting bank, Citizens was subject to the requirements of ordinary care and good faith. Thus, the bank must have used ordinary care and

---

1. All section citations will be to the Texas Business and Commerce Code in Vernon's Annotated Texas Civil Statutes unless otherwise indicated.

diligence in taking the steps necessary to accomplish the collection. It was bound to do all reasonable acts to procure payment and was required to observe such instructions as were given it by the owner of the item as to the manner in which the collection was to be made. Sec. 4.204(a). However, the law does not impose upon a collecting bank extraordinary duties. *See, Waggoner Bank & Trust Co. v. Gamer Co.*, 113 Tex. 5, 213 S.W. 927 (1919).

As a collecting bank of a documentary draft, the role of Citizens was largely governed by Subchapter E of Article IV of the Texas Business and Commerce Code. Pursuant to Section 4.501, Citizens forwarded the draft and accompanying documents to American Bank.[2] *See,* Sec. 4.105(5). Thereafter, American informed Cinco of the arrival of the documentary draft which placed the burden upon Cinco to respond to American's notification if the draft was not to be considered dishonored.[3] Sec. 4.210(a) and (b). *See,* Sec. 3.503(a)(2). However, after considering whether the draft was properly payable, Cinco did not simply allow the draft to be treated as dishonored, but forwarded a $30,000 cashier's check and simultaneously attempted to convey written instructions which imposed uncertain conditions upon final payment. *See* Sec. 3.505.

▆▆ Because American forwarded Cinco's instructions to Citizens, Cinco urges that Citizens owed it a duty to see to it that Bergman and Goodgame had complied with all of the requirements contained in Cinco's November 9, 1973 letter agreement with these two individuals. Cinco's rationale would place the burden on Citizens to as-

certain whether or not Bergman and Goodgame had used their "best efforts" to obtain full execution of the two lease amendments. Further, Cinco's reasoning would place the duty upon Citizens, as a collecting bank, to determine that point in time *at which Cinco* was in receipt of "satisfactory evidence" that the lessors had agreed to the two lease amendments. The latter contention would evidently require Citizens to maintain continual communications with Cinco. Nowhere does the Code provide that a collecting bank must comply with numerous nebulous instructions given it by a non-bank payor. In the absence of instructions clearly establishing the required conduct on the part of Citizens, we cannot say that Cinco's transmittal by mail of intangible conditions created a duty on the part of Citizens to be certain that Bergman and Goodgame had fully complied with all of the requirements set out in the November 9, 1973 letter agreement.[4] A collecting bank should not be placed in a position where it must assume the role of a final arbiter in discerning whether one party to a complex contract has fulfilled such requirements as "best efforts," or has furnished "satisfactory evidence" to another contracting party. In the instant case, what constituted "best efforts" or "satisfactory evidence" in Citizens view might be considerably divergent from Cinco's ideas as to what it intended these two phrases to mean.

▆▆ Finally, the terms of the crucial November 20, 1973 letter from American addressed to Citizens stated that "[e]nclosed is a Cashier's Check *for payment of your site* [sic] *draft* dated November 16, 1973 payable

---

**2.** The status of American Bank as an intermediary-collecting-presenting bank was also that of an agent for Bergman and Goodgame. *See* Sec. 4.201; Sec. 4.105.

**3.** In the typical commercial transaction, the duty of the presenting bank is to present the documentary draft for payment. If the sight draft is not timely paid, the presenting bank is required to endeavor with diligence to ascertain the reason for the dishonor, notify its transferor of the dishonor, and request further instructions. *See,* Sec. 4.503(1) and (2); Sec. 4.210(b); Sec. 2.514. Thus, subsequent to the dishonor, the presenting bank would seek further instruc-

tions from its transferor and ultimately, from the owners of the item. In the event of nonpayment or nonacceptance, the Code also speaks to the duty of a collecting bank to seasonably notify its customer of the dishonor. This duty is imposed even when the bank has bought the draft, so that the seller may know promptly whether or not his underlying contract is going through as planned. Sec. 4.501.

**4.** In order to maintain a degree of flexibility, the Code preserves the efficacy of agreements between the parties. *See,* Sec. 4.103(a); Sec. 4.201(a).

to Mr. Paul B. Goodgame and Mr. S. Harry Bergman pursuant to article eight of the letter agreement dated November 9, 1973 between Mr. Goodgame, Mr. Bergman and Cinco Exploration Company (copy enclosed). *Your payment is contigent* [sic] *upon performance of all other articles of the letter agreement . . . including, but not limited to the execution of the lease amendments . . . .*" [Emphasis added]. The only basis for charging Citizens with liability to Cinco is the above quoted letter. It is not clear whether these written instructions were intended to guide the disbursement conduct of Citizens as opposed to the future actions of Bergman and Goodgame. However, even if we assume as we have for summary judgment purposes, that these instructions were intended to be controlling of Citizens' actions, such an interpretation avails Cinco nothing. As a matter of law, the written instructions did not set forth by clear direction what Citizens would have been required to do. What is meant by "best efforts" or "satisfactory evidence" is certainly susceptible to a variety of interpretations and we could not *imply* Citizens' acceptance of such vague conditions under these facts. Thus, even if these instructions were intended to control Citizens' behavior, Citizens was not bound to do any more than it did with reference to such nebulous conditions. Citizens did inquire of Bergman whether he had done all that he was required to do under his agreement with Cinco. Only after receiving an affirmative response from its principal did Citizens deposit the $30,000 to the account of Bergman and Goodgame. We hold that Citizens discharged its summary judgment burden and accordingly, the judgment of the court of civil appeals is reversed and the judgment of the trial court is hereby affirmed.

STEAKLEY, J., concurs in the result.

DANIEL, J., notes his dissent.