**SOUTH CENTRAL LIVESTOCK DEALERS, INC., et al.,**
**Plaintiffs-Appellants,**

v.

**SECURITY STATE BANK OF HEDLEY, TEXAS, Defendant-Appellee,**

v.

**JOHN DAHL CONSTRUCTION COMPANY, Intervenor-Appellant.**

No. 75–4164.

United States Court of Appeals,
Fifth Circuit.

May 12, 1977.

John Huffaker, Wayne P. Sturdivant, Amarillo, Tex., for John Dahl Const. Co.

Thomas W. Kendrick, Amarillo, Tex., for South Central Livestock et al.

John T. Forbis, Childress, Tex., for defendant-appellee.

Before WISDOM and GEE, Circuit Judges, and BOOTLE *, District Judge.

GEE, Circuit Judge:

In this diversity action, a number of out-of-state cattle investors [1] at the now-defunct Donley County Feedlot located near Hedley, Texas, appeal the district court's grant of a directed verdict to the Security State Bank of Hedley, Texas, on their claims of wrongful offset and tortious interference with contractual relations. Concluding that a line of Texas cases gives credence to plaintiffs' claims, we reverse.

Charles Payne founded the Donley County Feedlot (the feedlot) as his personal business in 1968, incorporating it in 1969. The feedlot fed cattle to order for third persons, purchasing cattle for customers, fattening the cattle and then selling them to meat packers. The customers received the proceeds from those sales, less deductions for accrued feed and veterinary bills. The parties disagree about the nature of the relationship between the feedlot and its customers, but for the purpose of this appeal it

---

* Senior District Judge of the Middle District of Georgia, sitting by designation.

1. South Central Livestock Dealers, Inc., a Kentucky corporation, Mammoth Cave Production Credit Association, a federal production credit or cooperative association located in Glasgow, Kentucky, and Clarence Stuard, a Tennessee citizen, were the original plaintiffs in the action. John Dahl Construction Co., Inc., a Wisconsin corporation, and Continental Cattle Investments, Inc., a Nevada corporation, were granted leave to intervene by the district court. Continental Cattle Investments, Inc. dismissed its appeal and is not before the court in this appeal. For convenience we will refer to the original plaintiffs and the intervenor as "plaintiffs."

is sufficient that the feedlot acted at least as an agent for cattle investors such as plaintiffs.[2]

The feedlot did its financing through the defendant Security State Bank of Hedley, Texas (Security State). The feedlot started with only one account at Security State, the regular account. As the feedlot's business grew, Payne had difficulty keeping the feedlot's funds and those of cattle customers separated. Payne discussed this problem with Melvin Boothe, President of Security State, who agreed there was a need for separate accounts; and that day Payne opened a new account, the cattle account. The feedlot used the regular account for its operating expenses and salaries and the cattle account as a custodial account for the proceeds of sales of customers' cattle. The feedlot would write a check on the cattle account payable to the regular account to cover accrued feed and veterinary bills. Then the feedlot would write a check on the cattle account payable to the customer for the remainder of the proceeds. Although the parties disagree, we assume for purposes of this appeal that Security State at all times was aware of how the feedlot conducted its business. In fact, Payne testified that on at least one occasion the feedlot had overdrawn the cattle account when it wrote a check to purchase cattle for its customers before it received reimbursement and that Security State severely criticized the feedlot for overdrawing the cattle account when that account involved the handling of other people's money.

The events generating this lawsuit occurred in the early summer of 1974 when Security State, fearful of the feedlot's financial stability, began on Friday, July 12, 1974, to take steps to protect itself. On that date, without notifying the feedlot, the bank offset—i. e., applied funds in a debtor's account against indebtedness to the bank—the feedlot's regular account in the amount of $15,528.73. It also dishonored several checks totaling $29,751.01 drawn against the cattle account, including a check for $16,851.01 payable to plaintiff

Clarence Stuard. The next day, Saturday, Security State informed the feedlot that it would no longer loan funds, without telling the feedlot that Security State already had begun offsetting the feedlot's accounts. On Monday, while Payne was attempting to sell feedlot corporate stock in California to obtain additional operating capital, Security State persuaded Billy Clubb, Vice President of the feedlot, to renew a $172,000 note secured by the feedlot's accounts receivable. On Monday and Tuesday, July 15 and 16, Security State offset the entire balance of the cattle account, some $86,247.62. The feedlot did not learn of Security State's actions until Thursday, July 18, when Mr. Clubb went to the bank to deposit cattle sales proceeds and discovered that the bank had appropriated the entire cattle account. Later, Security State obtained constructive possession of the feedlot by sequestration. It then advised meat packers to pay it, not the feedlot or its customers, for cattle sold. By early August, the feedlot was in bankruptcy.

Plaintiffs brought suit alleging that the bank had wrongfully offset the cattle account and tortiously interfered with contractual relations between the feedlot and its customers. The district court granted Security State's motion for directed verdict on the ground that the plaintiffs had failed to show that Security State agreed to hold plaintiffs' funds as a trustee and to restrict the use of those funds to certain purposes, relying on *Citizens National Bank v. Hill*, 505 S.W.2d 246 (Tex.1974), and *Hudnall v. Tyler Bank and Trust Co.*, 458 S.W.2d 183 (Tex.1970). Concluding that Security State had a right to offset funds in the cattle account, the court likewise ruled that Security State could not incur liability for the results of its lawful act.

 The district court correctly concluded that under Texas law the described events did not create a "special account" with Security State as trustee or bailee. In a "special account" or "special deposit" ar-

rangement, a bank agrees to hold funds or items as a bailee or trustee, distributing the funds or items according to the agreement between the parties. *See Citizens First National Bank v. Cinco Exploration Co.,* 540 S.W.2d 292, 295 (Tex.1976); *Citizens National Bank v. Hill,* 505 S.W.2d 246, 248 (Tex.1974); *Hudnall v. Tyler Bank and Trust Co.,* 458 S.W.2d 183, 186 (Tex.1970). Texas law requires that to impress the trust or bailee relationship upon a bank so as to create a special account or special deposit, the bank must have agreed to that obligation. *Citizens National Bank v. Hill, supra,* 505 S.W.2d at 248. *See Citizens First National Bank v. Cinco Exploration Co., supra,* 540 S.W. at 295; *Hudnall v. Tyler Bank and Trust Co., supra,* 458 S.W.2d at 186. *See also In re Goodson Steel Corp.,* 488 F.2d 776, 779–80 (5th Cir. 1974). Although the bank was aware of the nature of the cattle account as depository for the proceeds on sales of others' cattle, the evidence does not suggest that Security State agreed to oversee the disbursement of funds in that account. Thus, plaintiffs' special deposit theory fails.

Viewing the evidence in the light most favorable to plaintiffs,[3] however, another line of Texas cases offers more promise to plaintiffs—sufficient to render the directed verdict erroneous. Texas has long held that if a bank knows that deposits by a debtor in his own name are in fact held by him in a fiduciary capacity, then the bank may not apply such funds to the individual indebtedness of the debtor. In *Steere v. Stockyards National Bank,* 113 Tex. 387, 256 S.W. 586, 589–92 (Tex.Com.App.1923, opinion adopted), a livestock commission dealer accepted consignments of cattle from shippers for sale. The dealer's normal practice was to deposit the proceeds of sale in his personal account, then remit the net proceeds to the shippers. The Stockyards National Bank, recipient of the dealer's deposits, knew of the dealer's business procedure. When the dealer created an indebtedness by overdrafting, the bank reduced the overdraft by applying deposited proceeds for the sale of cattle. The Court ruled that since the bank knew or had reason to know that the funds deposited were those of third parties it could not apply them to the debtor's indebtedness. In *National Indemnity Co. v. Spring Branch State Bank,* 162 Tex. 521, 348 S.W.2d 528, 529 (1961), the bank offset the account of an insurance agent indebted to it. The insurance agent's account included insurance premiums held by the agent pursuant to an express trust provided in the contract between the agent and the insurance company. The Supreme Court of Texas reiterated the *Steere* rule and went on to hold that even if a bank is unaware that funds in an account are subject to a trust, it may not offset trust funds. *See also Security Bank & Trust Co. v. Geren,* 288 F. 317 (5th Cir. 1923).

■ The evidence of Security State's involvement in adjusting the feedlot's financial affairs—including the chiding administered when the feedlot overdrew the cattle account, admonishing the feedlot that it was dealing with other people's money—suggests that Security State was aware of the fiduciary nature of the funds the feedlot held in the cattle account. If the line of cases we note remains Texas law, the evidence here makes a jury case.

■ Security State argues, however, that Texas' adoption of the Negotiable Instru-

---

**3.** In our review of a directed verdict, we have considered all the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc). The plaintiffs-nonmovants presented evidence supporting two assumptions upon which we rely in our discussion: first, that the relationship between the feedlot and the plaintiffs was not a simple debtor-creditor relationship but that of principal-agent, *cf. Valley View Cattle Co. v. Iowa Beef Processors,*

548 F.2d 1219, 1221 (5th Cir. 1977) (agency relationship may be implied from conduct of parties); *Clinkenbeard v. Central Southwest Oil Corp.,* 526 F.2d 649, 653 (5th Cir. 1976) (agency relationship may arise without formalities of agency contract); and second, that Security State had knowledge that the funds in the cattle account equitably belonged to third parties. At trial, of course, those facts may be found otherwise; we determine only that they might reasonably be found as we have above assumed.

ments Law (NIL) in 1919, *see generally*, Tex.Rev.Civ.Stat.Ann. arts. 5932–48 (1962), and its adoption of the Uniform Commercial Code in 1965, *see generally* Tex.Bus. & Comm.Code (Tex.UCC 1968), have nullified this line of Texas cases. We are not persuaded. It is true that *Steere v. Stockyards National Bank, supra,* was based on events transpiring in 1917 and 1918, prior to Texas' adoption of the NIL in 1919. Yet the rule of law in *Steere* was cited with approval in *National Indemnity Co. v. Spring Branch State Bank, supra,* 348 S.W.2d at 529, *after* Texas' adoption of the NIL. Further, language in cases from the Texas intermediate appellate courts suggests that the *Steere* rule, reiterated in *National Indemnity,* is still good law after passage of the UCC, at least where not explicitly displaced by the UCC. In *First National Bank v. Lone Star Life Insurance Co.,* 524 S.W.2d 525 (Tex. Civ.App., Dallas 1975, no writ), the Dallas Court of Civil Appeals observed that:

> [T]he rule in *National Indemnity* is still the law in Texas except for cases like the present [procedures for creating a security interest in a certificate of deposit], in which it has been displaced by the Code. Tex.Bus. & Comm.Code Ann. § 1.103 (Tex.UCC 1968).

524 S.W.2d at 529. *See also Christian v. First National Bank,* 531 S.W.2d 832, 839–40 (Tex.Civ.App., Ft. Worth 1975, writ ref'd n. r. e.) (citing *National Indemnity*). The Texas UCC itself states that: "Unless displaced by the particular provisions of this title," prevailing Texas law still governs. Tex.Bus. & Comm.Code Ann. § 1.103 (Tex.UCC 1968). We conclude that in such a case as ours, the Texas Supreme Court would adhere to the *National Indemnity* rule.

■ Security State also argues that if the *National Indemnity* rule is still good law, it is limited to the situation in which a debtor holds funds in his account pursuant to an express trust. It is true that in *National Indemnity* the insurance agent-debtor held the premiums pursuant to such an express trust. In our case, because the feedlot had no agreement with its customers creating a similar express trust, argues Security State, *National Indemnity* is inapplicable.

■ We believe that the law stated in *National Indemnity* is not so limited: the existence of an *express* trust was not a requirement in *Steere v. Stockyards National Bank,* 113 Tex. 387, 256 S.W. 586 (Tex.Com.App.1923, opinion adopted). In *Steere* the consignors successfully urged, in the absence of an express agreement, that the proceeds had a trust character rendering them immune to the bank's offset. Again, we think that under Texas law the nature of the trust is not dispositive; [4] it is the bank's knowledge that the debtor has deposited in his account funds belonging to another and thus held in a fiduciary capacity that precludes the offset. When the feedlot deposited proceeds of the sale of plaintiffs' cattle in the cattle account, it arguably did so in its fiduciary capacity as agent for the plaintiffs. [5] *Cf. Bradley Grain Co. v. Farmers & Merchants National Bank,* 274 S.W.2d 178 (Tex.Civ.App., Eastland 1954, writ ref'd n. r. e.) (when grain seller

4. In *National Indemnity Co. v. Spring Branch State Bank,* 162 Tex. 521, 348 S.W.2d 528 (1961), the nature of the trust may have been of importance because there the Texas Supreme Court assumed that the bank was *unaware* of the trust nature of the funds. The question was whether, even so, equity prevented the bank's offset of those funds. The court ruled that if the bank had not changed position to its detriment or if no superior equities arose in its favor, the bank must return the funds to the equitable owner. The court's equitable choice against offset further strengthens our belief that Texas law would not allow offset in our case.

5. Plaintiffs also argue that the funds held in the cattle account were impressed with a resulting trust. This issue was not pleaded nor tried in the court below, and we do not consider it. *See Guerra v. Manchester Terminal Corp.,* 498 F.2d 641, 658 n.4 (5th Cir. 1974). This is not a case where our refusal to consider the new legal theory would result in manifest injustice. *See Martinez v. Mathews,* 544 F.2d 1233, 1237 (5th Cir. 1976); *Higginbotham v. Ford Motor Co.,* 540 F.2d 762, 768 n.10 (5th Cir. 1976). Plaintiffs are free on remand to seek amendment of their pleadings to pursue the resulting trust theory.

not agent, offset allowed). The plaintiffs-principals' funds were not subject to offset if they were, and the bank had knowledge that they were, the funds of third parties.[6]

■ Our conclusion that Security State may incur liability for wrongful offset also requires reversal of the district court's directed verdict on tortious interference with contractual relations. The district court predicated its dismissal of this cause of action on its ruling that the bank properly offset the funds in the cattle account. Although the plaintiffs did not ground their tortious interference cause of action on that act alone, Security State's offset did play an important part in the disruption of relations between the feedlot and the plaintiffs. Our decision that the offset may have been wrongful revives the plaintiffs' cause of action.

■ Under Texas law, a tortious interference with a contract entails intentional and willful acts calculated to cause damage and with the unlawful purpose of causing damage to the contracting parties without just cause or lawful right. *See Tippett v. Hart*, 497 S.W.2d 606, 609–11 (Tex.Civ.App., Amarillo 1973), *writ ref'd n. r. e.*, 501 S.W.2d 874 (Tex.1973) (per curiam); *Cooper v. Steen*, 318 S.W.2d 750, 753 (Tex.Civ.App., Dallas 1958, no writ); 33 Tex.Jur.2d *Interference* § 2, at 96. *See also Black Lake Pipeline Co. v. Union Construction Co.*, 538 S.W.2d 80, 91 (Tex.1976); *Clements v.*

*Withers*, 437 S.W.2d 818, 820–21 (Tex.1969); *Leonard Duckworth, Inc. v. Michael L. Field & Co.*, 516 F.2d 952, 955–56 (5th Cir. 1975); *Robey v. Sun Record Co.*, 242 F.2d 684, 687 (5th Cir.), *cert. denied*, 355 U.S. 816, 78 S.Ct. 20, 2 L.Ed.2d 33 (1957). The evidence, viewed most favorably to plaintiffs, can support the view that Security State employed a number of devices to protect its interests with full knowledge that its action would interfere with the feedlot's contractual relations with its customers and employed the devices without just cause or legal right.[7] The final resolution of all these issues remains, however, with the district court, and we in no sense pass on their merits.

■ We recognize that our decision—until revised by the Texas courts if incorrect [8] —may restrict the power of Texas banks to offset accounts to cover a debtor's loan. Nevertheless, a Texas bank's power to offset is equitable in nature, and it may be overborne by superior equities. *First National Bank v. Winkler*, 139 Tex. 131, 161 S.W.2d 1053, 1056 (Tex.Com.App.1942, opinion adopted). On the evidence, the equities of the plaintiffs may be superior. As the *Steere* court noted: "If this cause some inconvenience, it would still seem to us preferable to a rule which would require one man to pay another's debts without receiving any value therefor." 256 S.W. at 592.

REVERSED and REMANDED.

---

6. It is a matter of dispute whether Security State had knowledge of the fiduciary character of the funds and whether the feedlot was in a fiduciary relationship with the plaintiffs, *see* note 3, *supra*. If these matters are resolved in plaintiffs' favor, the *Steere* rule should control. We should observe, however, that if it is shown the funds were held by the feedlot in a fiduciary capacity but the bank had no knowledge, plaintiffs' recovery is not inevitably barred. Considering the equities, it is not inconceivable that Texas would extend the *National Indemnity* rule to bar bank offset of funds held in *any* sort of fiduciary arrangement, regardless of the bank's knowledge of their fiduciary character. *Cf. Cassidy Commission Co. v. Security State Bank*, 333 S.W.2d 454, 458–60 (Tex.Civ.App., Houston 1960, no writ) (bank which offset debtor's account without knowledge could not retain principal's funds wrongfully deposited in agent-debtor's personal account).

7. For example, the evidence, read in the light most favorable to the plaintiffs, indicates that the feedlot was solvent when Security State began offsetting the feedlot's accounts. A jury could conclude on those facts that Security State was unjustified in its actions against the feedlot.

8. The peculiar question of Texas law upon which this case turns has the precision and uncertainty that would render certification to the Texas Supreme Court a valuable tool. We have had occasion to note the usefulness of certification procedures in other states, *see United States v. 16.33 Acres of Land in Dade County, State of Florida*, 537 F.2d 182, 183 (5th Cir. 1976), and we bemoan the fact that Texas has not adopted a similar certification procedure.